Bradford G. BROWN, Appellant

v.

UNITED STATES, Appellee.

No. 03–CF–777.

District of Columbia Court of Appeals.

Argued May 24, 2007.

Decided Sept. 20, 2007.

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein, Samia Fam, and Shilpa S. Satoskar, Public Defender Service, were on the brief, for appellant.

Stratton C. Strand, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and FARRELL and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Appellant Bradford Brown appeals from his convictions for unlawful distribution of cocaine and unlawful possession of heroin. *See* D.C.Code §§ 48–904.01(a)(1) & (d). Brown contends that the trial court committed reversible error by excluding certain evidence and argument that he contends was "central to the defense theory" regarding the unlawful distribution charge. He also contends that the trial court erred in denying his pre-trial motion to suppress

evidence that police obtained after forcibly entering, without a search warrant, the apartment where he was a guest. We reject these contentions and affirm Brown's convictions.

## I.

On March 22, 2002, members of the Metropolitan Police Department were conducting a buy-bust operation in the Trinidad area of Northeast Washington. At about 1:00 a.m., three officers were traveling in an unmarked car: Investigator Walter Ellerbe was driving and Officer Karen Taylor and Investigator Randall Parker were passengers. All were dressed in civilian clothing, and none carried a badge or handcuffs. Investigator Parker saw a woman, later identified as Maureen Thorne, standing on the corner. He engaged her in conversation and told her he wanted to purchase two "dime bags" of crack cocaine. Thorne stated, "I'll take you to get them." She got into the car and gave the team directions to the 1700 block of Capitol Avenue, N.E. Investigator Ellerbe stayed in the car while Investigator Parker and Officer Taylor went with Thorne to 1720 Capitol Avenue, Apartment 2.

Thorne knocked on the apartment door and a female voice answered "Who is it?" Thorne responded by saying "Maureen." Patricia Ingraham opened the door and told Thorne and the two officers to come in. The officers saw three people besides Ingraham in the apartment: an older woman on the couch in the living room, later identified as Edwina Powell, the resident of the apartment; appellant, watching television in the living room; and a man later identified as Paul Morris sitting at a table in a dining room area behind the living room.

According to the undercover officers' testimony, Thorne walked toward Morris in the dining room, telling Investigator Parker, "get [your cocaine] from [Ingraham]; I'm getting mine from Paul." Officer Taylor watched Thorne approach Morris in the dining room, saw Thorne give Morris money, and watched Morris cut cocaine on a mirror and give some to Thorne. While that transaction was occurring, Ingraham asked Investigator Parker, "What you want?" and he asked for two $10 bags of crack. Ingraham asked for money and Investigator Parker handed her $20 in pre-recorded bills. Ingraham took the money to appellant and told appellant that Parker had asked for crack. Appellant reached into his right sock, pulled out a clear bag that contained tannish-white loose rocks, and handed it to Ingraham. He also pulled out some green baggies but put those back into his sock.

Ingraham emptied three rocks onto a nearby living room table. She split one of the rocks into two pieces with a razor and, with a bobby pin, pushed the two halves of the rock into purple baggies. Ingraham gave the baggies to Parker and left the remaining cocaine on the table. As the officers walked toward the door to exit the apartment, Investigator Parker spoke to appellant, saying "All right, Brown." Appellant responded "All right, see you, Shorty."

The undercover officers went straight back to their vehicle and Investigator Parker radioed a description of the individuals involved in the sale of drugs and the location and lay-out of the apartment to the arrest team. Investigator Parker further told the team that "Bradford Brown is in the apartment. That's who I bought from." Investigator Parker made this comment about appellant Brown because police had an outstanding arrest warrant for Brown in connection with another case.

Within minutes, the arrest team went to the apartment and knocked. The officers heard a female voice say "It's the police, it's the police." Hearing sounds "like people running out of the apartment," and hearing a police officer who was stationed at the back of the apartment radio "there [are] people coming out the back," one of the officers kicked open the door. Police found appellant sitting in a chair at the dining room table.

Appellant subsequently was identified by the undercover buy-bust team during a drive-by identification. Officers searched appellant incident to arrest and found in his right sock three green baggies of white powder, which later tested positive for heroin. Officers also found on appellant $179 in cash, including the $20 in pre-recorded funds.

## II.

■ Appellant argues that the trial court erred by cutting off and then precluding questioning and argument designed to establish that (1) the arrest team found Morris hiding in a closet with what defense counsel proffered was "a large rock of cocaine and a substantial amount of money;" (2) the arrest team found cocaine and drug paraphernalia at the dining room location where Morris had been sitting and selling cocaine; and (3) no cocaine or paraphernalia were found on the living room table where the dime bags sold to Officer Parker allegedly were prepared. The trial court's rulings, appellant argues, kept his trial counsel from providing to the jury a basis for inferring that Morris rather than appellant was the individual who sold cocaine to the police. He urges that the court's rulings thus prevented him from presenting a complete defense.

A review of the record shows that the defense was not entirely precluded from presenting evidence and argument on points (2) and (3). Over the government's strong objections, the trial court allowed appellant's trial counsel to elicit testimony from Officer Taylor that she saw Morris sell to Thorne "some of the cocaine that he was cutting up on a mirror at the [dining room] table." The defense also elicited testimony from Officer Dino McFadden, a member of the arrest team, that he "believe[d] a mirror was recovered, [or] may have been" recovered from the dining room table. In addition, defense counsel elicited testimony that no cocaine was found on appellant when he was arrested and that no empty ziplock bags were found in the apartment. And, during closing arguments, defense counsel emphasized that the government had presented no photographs or physical evidence of the items that police testified Ingraham had used in preparing the cocaine sold to Investigator Parker, *i.e.*, the clear plastic bag, razor blade, and bobby pin.[1]

Although the jury did hear a question from defense counsel about whether police found Morris in a closet the trial court cut off that inquiry and thereafter repeatedly refused to allow the jury to hear that Morris was arrested in a bedroom closet and that a rock of cocaine was found on the ground next to him. The court reasoned that there was no evidence from which the jury could reasonably find that

1. Defense counsel told the jury, "And [police] both say there's more cocaine in that bag. And you have no evidence that cocaine was ever recovered, that there's a clear plastic bag taken from that apartment.... It wasn't there. What else wasn't there? Razor blade, bobby pin, a spoon, any other paraphernalia.... They are not on the little table like the officers said they would be.... Photographs of the evidence. Photograph of that little dinette table with the razor blade or a bobby pin. The Government hasn't produced anything of the sort...."

Morris rather than Brown sold drugs to the undercover officer.[2] The court instructed that it was "not going to permit [the defense] to put before the jury an argument that it might have been Mr. Morris, not Mr. Brown, when there's no evidence to support that, not a shred of it, not even what you could piece together from reasonable inferences."

■ Appellant claims that the court's instruction prevented him from presenting a *Winfield*[3] defense, *i.e.,* a defense that someone else committed the crime charged. However, as we held in *Winfield,* while "a substantial proffer that a third person committed the offense implicates the defendant's constitutional right to a meaningful opportunity to present a complete defense," 676 A.2d at 6–7 (internal citation and quotation omitted), to be substantial such a proffer must point to a "link, connection or nexus between the proffered evidence" and the particular offense charged. *Id.* at 4 (internal citation and quotations omitted). We conclude that the excluded evidence about Morris was devoid of such a nexus, and that the trial judge did not abuse his discretion in excluding it as irrelevant. We also conclude that even if it were relevant, any error in its omission was harmless.

■ "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence."

*Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) (citation omitted); *see also* FED.R.EVID. 401. "[T]he test for relevance is not a particularly stringent one," *Street v. United States,* 602 A.2d 141, 143 (D.C. 1992) (citation omitted), requiring only a "reasonable possibility" of a link between the contested evidence and the crime. *Winfield,* 676 A.2d at 4. To be relevant, evidence "need only tend to create a reasonable doubt that the defendant committed the offense." *Id.* (citation, quotation, and emphasis omitted); *see also Martin v. United States,* 606 A.2d 120, 128 (D.C. 1991) ("It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence." (quotation and citation omitted)). We entrust a decision of evidentiary relevance to the trial court's discretion, to which we owe substantial deference; we will overturn it only on a showing of abuse of discretion. *See, e.g., Bowman v. United States,* 652 A.2d 64, 68 (D.C.1994); *Punch,* 377 A.2d at 1358.

Asserting that the principal issue as to the cocaine distribution charge was "who sold cocaine to Officer Parker during the undercover buy," appellant argues that the evidence that Morris was found in the bedroom closet with a rock of cocaine made it more probable that Morris rather than appellant was the seller. We disagree.[4] It was undisputed by the government that Morris was a drug dealer; in-

---

2. In excluding the evidence about Morris having been found in the closet with a rock of cocaine next to him, the court also noted that Brown had "moved for severance [of his trial from Morris's] on the ground that evidence [about Morris' activities] was unfair as to Mr. Brown."

3. *Winfield v. United States,* 676 A.2d 1 (D.C. 1996) (en banc).

4. We are also doubtful that the introduction of further evidence showing that "police

found cocaine and drug-dealing implements in the dining room, but not the living room" would have rendered it more probable that Morris rather than appellant sold cocaine to police. Members of the arrest team testified that appellant was seated at the dining room table when they entered the apartment, and Powell also testified that appellant was sitting in the dining room. This testimony could have suggested to the jury an association between appellant and the cocaine paraphernalia found in the dining room.

deed, substantive evidence was admitted at trial that police saw Morris sell cocaine to Thorne. Additional evidence of Morris being a drug dealer—*i.e.*, that Morris was found with cocaine, hiding in a closet, and that cocaine and related paraphernalia were found on the dining room table where Morris had been sitting when undercover police were in the apartment—would not have made it less likely that appellant, too, dealt cocaine. In other words, such evidence would not have advanced the "defense theory that there was only one dealer in the apartment."[5] More particularly, the excluded evidence about Morris would not have made it less probable that appellant was the dealer who sold cocaine to Investigator Parker. Because Investigator Parker knew appellant by sight and name and there was no possibility of mistaken identity, evidence that Morris was a cocaine dealer did not "create a real possibility that [Morris] was the perpetrator."

■ Thus, the inference from the excluded evidence that Morris—to the *exclusion* of appellant—sold cocaine to the undercover officer at the time in question was a weak one. In any event, even if we assume *arguendo* that it was error to exclude the additional evidence about Morris—because Morris had the "practical opportunity to commit the crime," *Winfield*, 676 A.2d at 5—the error was harmless beyond a reasonable doubt.[6] During closing argument, appellant's trial counsel, utilizing his "wide latitude in drawing inferences from the record," *United States v. DeLoach*, 164 U.S.App. D.C. 116, 121, 504 F.2d 185, 190 (1974), ran through the "cast of characters" from the apartment that evening. Counsel emphasized that among those characters was the "well-dressed young man who Officer Taylor [testified] was sitting in the background, cutting up cocaine on a mirror ... and sold it to Maureen Thorne. Now Bradford Brown is not a dealer." During closing argument, defense counsel also referred to the testimony that no cocaine was found on appellant at the time of his arrest, and emphasized that, while other people in the apartment were running when police en-

5. Appellant argues that, in excluding the evidence about Morris, the trial judge "usurped the role of the jury by accepting the government's theory of the case" that there were two dealers in the apartment. The court's comments, however, make clear that the court did not lose sight of the fact that whether to credit the account by the government's witnesses was an open issue: "[The police officers] are either telling the truth or they are not.... And if they're not, I don't think there's any evidence from which the Defense could argue that it was Mr. Morris, not Mr. Brown."

Appellant also argues that an inference of "only one dealer in the apartment" would have been supported by the testimony of the government's expert who testified that "three or four dealers may sell *different products*" out of the same apartment or building (emphasis supplied). Appellant asserts that this testimony means that two dealers would not both sell cocaine out of the same apartment, but we do not interpret the expert's reference to "different products" so restrictively. We

note that the expert also testified that "You might have three or four dealers working for a main guy who's not even around the neighborhood, that drops off the package. And four or five dealers in one house are selling for that guy." In light of this testimony, further evidence about Morris's cocaine dealing would not "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Winfield*, 676 A.2d at 5 (internal citation, quotation, and emphasis omitted).

6. *See Newman v. United States*, 705 A.2d 246, 258 (D.C.1997) ("Because [defendant's] proffer of extrinsic evidence ... to show a reasonable possibility that someone else committed the crime implicated both the right of confrontation and the right to present a defense, ... we are satisfied that the constitutional harmless error standard applies here. Our next step, therefore, is to determine whether the exclusion of the proffered evidence was harmless beyond a reasonable doubt." (internal citations and quotation omitted)).

tered the apartment, appellant remained seated, not hiding, because "he [did not] have anything to hide." Thus, defense counsel did effectively invite the jury to consider that Morris rather than appellant was the dealer. Furthermore, in its closing, the government sought to rebut, and thereby reminded the jury of, the (very obvious) defense theory, telling the jury, "You heard that there were two guys in that apartment that night: Paul [Morris] in the dining room, and Bradford Brown in the living room.... They look nothing like each other.... It was [Defendant Brown] with that clear plastic bag of loose rock cocaine. It was him who gave it over to be sold to the undercover officers and it was him who had the prerecorded funds on him...." We therefore cannot agree with appellant's contentions that the jury "never heard the defense theory that Mr. Morris could have been the culpable party" and that "the court's rulings left the defense with no way to suggest an answer to [the] question" of "who else the cocaine could have come from."

### III.

■ Prior to trial, appellant moved to suppress physical evidence obtained as a

result of the arrest team's entry into the apartment.[7] He argued, and contends again on appeal, that as the officers did not have a search warrant for the premises and as he had a legitimate expectation of privacy in the apartment as a frequent guest, the entry of the arrest team violated the Fourth Amendment. Citing *Morton v. United States*, 734 A.2d 178 (D.C.1999), the trial court found that Brown had a legitimate expectation of privacy in the apartment as an invited guest of Powell, the owner of the premises. *See id.* at 182 (holding that because "social guests of the host generally have a legitimate expectation of privacy, ... appellant met his burden of showing that he had a protectible interest in the house the police entered in order to seize him"). The court ruled, however, that although the police officers had no search warrant, their forcible entry into the apartment on a valid arrest warrant for appellant, while "reasonably ... believing that admission was being denied," was permissible within the bounds of the Fourth Amendment.[8] We affirm the trial court's ruling.

■ Although generally a search warrant is required before police may enter a

---

7. Appellant sought to suppress the heroin and cash that police found on him and the undercover officers' drive-by identification of him, all of which, he contends, were fruits of the arrest team's unlawful entry into Apartment 2.

8. As the discussion in the text explains, the trial judge denied the motion to suppress on the basis of the arrest warrant and the arrest team's reasonable belief that they were being denied entry after knocking on the door of Apartment 2 to execute the arrest warrant. Before ruling on the motion to suppress, the court had earlier rejected the suggestion that the forcible entry into the apartment without any type of warrant would have been justified by exigent circumstances (such as the risk that the occupants of the apartment would dispose of the drug evidence that the under-

cover officers had observed), reasoning that uniformed police had "created [their] own exigency" by knocking on the door and revealing their presence. *Cf. United States v. Newman*, 472 F.3d 233, 238 (5th Cir.2006) ("Officers may not impermissibly create exigent circumstances by revealing their presence in order to alert suspects who would, in response, destroy evidence....").

The facts of this case might have occasioned consideration of whether to adopt the so-called "consent once removed" doctrine, followed by at least a handful of courts. *See, e.g., State v. Henry*, 133 N.J. 104, 627 A.2d 125, 131 (1993) (holding that where an undercover officer's initial entry into an apartment was consensual, the undercover officer witnessed the commission of a crime, and upon leaving the apartment the undercover officer immediately notified his backup arrest team

private dwelling, *see, e.g., Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), police with only an arrest warrant have "the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Payton,* however, is not "on all fours" with the case at bar, as appellant was not in the "dwelling in which [he] live[d]." Appellant argues that the Supreme Court precedent that controls here is *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

The pertinent facts of *Steagald* are that police entered Steagald's home with a valid arrest warrant for another individual, Lyons. *Id.* at 206, 101 S.Ct. 1642. While on the premises, officers confiscated cocaine and other contraband located in plain sight. *Id.* On the basis of what they observed, police thereafter obtained a search warrant and found an additional forty-three pounds of cocaine. Steagald was arrested on federal drug charges based upon the evidence recovered. *Id.* at 206–07, 101 S.Ct. 1642. Steagald moved to suppress the evidence, arguing that his Fourth Amendment rights were violated when the police entered his home on the arrest warrant for a third party. *Id.* at 207, 101 S.Ct. 1642. The Court agreed, stating that while the arrest warrant for Lyons "may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect petitioner's privacy interest in being free from an unreasonable invasion and search of his home." *Id.* at 213, 101 S.Ct. 1642.

*Steagald* held that the "intrusion and search of a third-party's home in reliance on the arrest warrant issued for another individual violated the Fourth Amendment privacy rights of the homeowner." *United States v. Pruitt,* 458 F.3d 477, 481 (6th Cir.2006). *Steagald* would be controlling if Ms. Powell, the resident of Apartment 2, were seeking suppression of the evidence, recovered from her home when police entered on an arrest warrant for appellant, that the government was seeking to use against her. But that is not the case before us. Rather, this case concerns the use of evidence against the person named in the arrest warrant, and the question at hand is whether officers may rely on a valid arrest warrant, and a reasonable belief that the subject of that warrant is in the residence of a third party, to enter the residence to execute the warrant. We agree with the trial court, and with other appellate courts that have considered the issue, that to answer this question, we must return to the holding of *Payton.*

As the trial court recognized, under *Payton,* "[p]olice could enter Mr. Brown's home forcibly, if necessary, with nothing

that was waiting a short distance away, the backup team's subsequent non-consensual entry into the apartment fifteen to twenty minutes later to make arrests was a "component[ ] of a single, continuous, and integrated police action" and did not violate the Fourth Amendment); *see also United States v. Pollard,* 215 F.3d 643, 648–49 (6th Cir.), *cert. denied,* 531 U.S. 999, 121 S.Ct. 498, 148 L.Ed.2d 469 (2000); *United States v. Bramble,* 103 F.3d 1475, 1478–79 (9th Cir.1996); *United States v. Diaz,* 814 F.2d 454, 459 (7th Cir.), *cert. denied,* 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987) ("we have applied this doctrine of 'consent once removed' only where the [law enforcement] agent ... entered at the express invitation of someone with authority to consent, at that point established the existence of probable cause to effectuate an arrest or search, and immediately summoned help from other officers"). However, the government has not suggested that the search and seizure involved here can be justified on the basis of this doctrine, and neither party has briefed its merit (or lack thereof). Accordingly, we do not consider the doctrine, noting only that it may be the proverbial "elephant in the room."

more than an arrest warrant." We agree with the trial court's reasoning that appellant "ha[d] no greater Fourth Amendment rights in Ms. Powell's home than he would have in his own," reasoning that is consistent with the conclusion reached by many other courts in similar contexts. *See Pruitt*, 458 F.3d at 482 (quoting *United States v. Buckner*, 717 F.2d 297, 300 (6th Cir.1983)); *United States v. Agnew*, 407 F.3d 193, 197 (3d Cir.2005) (quoting *United States v. Underwood*, 717 F.2d 482, 484 (9th Cir.1983) (en banc)); *United States v. Clifford*, 664 F.2d 1090, 1092–93 (8th Cir. 1981). Put another way, if officers with an arrest warrant for appellant could legally enter the home of appellant to arrest him and to search him incident to arrest, they could enter the residence of a third party to effectuate that same arrest and search, assuming the officers had a reasonable belief that appellant was in the third party's home.[9] *See, e.g., Pruitt*, 458 F.3d at 481–82; *Agnew*, 407 F.3d at 197; *Underwood*, 717 F.2d at 484; *Buckner*, 717 F.2d at 300; *Clifford*, 664 F.2d at 1092–93.

Appellant argues that even if *Payton* is applicable by extension, the *Payton* warrant exception requires an independent magistrate to determine that appellant is in the dwelling to be entered. *See Steagald*, 451 U.S. at 214 n. 7, 101 S.Ct. 1642 ("[T]he magistrate, rather than the police officer, must make the decision that probable cause exists to believe that the person or object to be seized is within a particular place."). Because an independent magistrate did not determine that there was probable cause to believe that appellant was in Ms. Powell's home, appellant argues, his Fourth Amendment rights were violated.

We find this argument unpersuasive. *Payton* mandates that officers have a "reason to believe the suspect is within." 445 U.S. at 603, 100 S.Ct. 1371. As the United States Court of Appeals for the Fifth Circuit has observed, while

> Probable cause ... must always be determined by a magistrate unless exigent circumstances excuse a warrant.... Reasonable belief embodies the same standards of reasonableness but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate.

*United States v. Woods*, 560 F.2d 660, 665 (5th Cir.1977) (internal citation and quotation omitted). *See also United States v. Route*, 104 F.3d 59, 62 (5th Cir.1997). We agree with the United States Court of Appeals for the Sixth Circuit and other courts that a "reasonable belief standard, and not probable cause, is sufficient to allow officers to enter a residence to enforce an arrest warrant...." *Pruitt*, 458 F.3d at 482. *See also Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir.1999) (identifying several factors that could indi-

---

9. Citing a treatise by Professor Wayne LaFave, *see* 6 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.3(b) at 159 (4th ed. 2004), appellant argues that the foregoing is "bizarre reasoning" that "contravenes settled Fourth Amendment doctrine" and that "would render the *Steagald* rule a virtual nullity." We think appellant misapprehends Professor LaFave's point. Professor LaFave recounts the *Steagald* decision and then briefly quotes *Clifford*, one of the first Circuit Court cases to adopt the reasoning we now adopt. Professor LaFave then goes on to say that some courts have "[p]ush[ed] the analysis *another* step further ... rul[ing] that the visitor-arrestee cannot complain about the absence of *any kind* of a warrant." LAFAVE, *supra*, at 159 (emphasis added). It is *this* reasoning that LaFave calls "bizarre" and unable to be "squared" with the Fourth Amendment. *Id.* Our decision here implies no such reasoning; here, there was a valid arrest warrant for appellant, and police entered the apartment on that warrant.

cate that a defendant was on the specified premises); *Route,* 104 F.3d at 62 n. 3 (collecting cases adopting the "reasonable belief" standard from the Second, Third, Eighth, Tenth, and Eleventh Circuits); *United States v. Magluta,* 44 F.3d 1530, 1534–35 (11th Cir.1995) (quoting *Woods,* 560 F.2d at 665); *United States v. Terry,* 702 F.2d 299, 319 (2d Cir.1983) (detailing the evidence officers used to conclude there was a "reasonable basis for believing" appellant was in the apartment).

In this case, two undercover police officers actually saw appellant in Powell's apartment and stood only about five feet away from him. Investigator Parker knew appellant from previous police contact. On his way from the apartment, Parker even addressed appellant by name and appellant responded. When he returned to his vehicle, Parker radioed the arrest team and mentioned appellant by name. This was sufficient evidence to provide the investigators and arrest team with a reasonable belief that appellant was in Powell's apartment.

*Affirmed.*