Calvin WOODS, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–760.

District of Columbia Court of Appeals.

Submitted June 16, 2009.

Decided Jan. 21, 2010.

Thomas D. Engle and Sharon L. Burka were on the brief, for appellant.

Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., Steven B. Wasserman, and Nicholas P. Coleman, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, FISHER, and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant Calvin Woods contends in this appeal that the trial court abused its discretion by admitting the plea agreement for one of the government's witnesses.

We note that the particular circumstances of this case present a matter of first impression: we must determine whether the government may introduce evidence of a plea agreement with a government witness on direct examination where the defense has stipulated that it will refrain from any cross-examination regarding bias relating to that plea agreement. Appellant also argues that the trial court erred by preventing him from testifying about his prior inconsistent statements on direct examination, especially because the court thereafter allowed the government to cross-examine him about those same statements. For the reasons explained more fully herein, we affirm.

## I.

A jury convicted appellant Calvin Woods of voluntary manslaughter while armed (VMWA) [1]; possession of a firearm during a crime of violence (PFCV) [2]; carrying a pistol without a license (CPWL) [3]; possession of an unregistered firearm (UF) [4]; and unauthorized possession of ammunition (UA).[5] The evidence at trial showed that appellant was waiting in line at the Veteran Affairs Medical Center Community Clinic on June 22, 2005 when a car pulled up to the clinic and two men got out. One of the men, Allen Young (the decedent), approached and robbed appellant's companion Milton Boddie at gunpoint. Young then approached appellant, stuck the gun into his stomach, and said, "Give me your money, too!" Appellant handed Young sixty dollars.

After Young walked away, appellant approached Thomas Harris, a friend who he knew had a gun, and told him, "The guy

1. D.C.Code §§ 22–2105 and –4502 (2001).

2. D.C.Code § 22–4504(b) (2001).

3. D.C.Code § 22–4504(a) (2001).

4. D.C.Code § 7–2502.01 (2001).

5. D.C.Code § 7–2506.01 (2001).

who just pulled up robbed Milton." Harris gave appellant his .38 caliber revolver and said, "If you use it, don't give it back." Appellant testified that he got the gun because he wanted to get his money back. From this point, there are three different accounts of what happened next.

According to appellant, he approached Young from behind with the gun at his side and demanded his money back. Young "lifted up his shirt and reached for [his] pistol like he done earlier" and appellant reacted, firing a shot at his head, from a distance of six to eighteen inches. But one of the witnesses to the shooting, Rodney Nicholson, saw it differently: he claimed that Young had no time to make any movement before the shot. Nicholson further testified that he did not hear any conversation between Young and appellant, but because of where he was standing, he would have been able to hear their voices only if they were yelling or talking loudly.[6]

Similar to appellant's account, Harris testified that he saw appellant walk up behind Young. As appellant got closer, Young turned slightly and reached toward his waist just before appellant pointed the gun at Young's head. Harris also testified that Young looked like he was about to flee before being shot.

The next day, Harris and appellant discussed the shooting. Appellant told Harris that he would not tell the police he acquired the gun from Harris if "anything went down." A few days later, Harris lied to the police, telling them that he did not see the shooting because he was "relieving [him]self" at the time. Also, on the day after the shooting, appellant went to the police to report that his car was stolen. In response to questioning about the shoot-

ing, appellant said he did not know about it, he just ran from the area at the same time as everyone else. Later in the year, appellant learned that there was a warrant for his arrest and turned himself in.

At trial, the medical examiner who performed Young's autopsy testified that he died from a gunshot wound to the head. Specifically, the medical examiner testified that the bullet entered Young's skull near his left temple.

## II.

### A.  *The Plea Agreement*

■  Before trial, appellant filed a motion *in limine* to preclude the government from introducing the fact that its witness, Thomas Harris, had entered into a plea agreement, arguing that the plea agreement would impermissibly bolster Harris' testimony and prejudice appellant. Under the plea agreement, Harris pled guilty to voluntary manslaughter and carrying a pistol without a license and the government dropped the first-degree-murder charge. Appellant argued that the jury would be more likely to believe Harris' second account of the shooting—rather than the story he initially gave the police (*i.e.,* that he had not seen anything because he was "relieving himself")—once it knew about the possible consequences Harris faced if he did not corroborate the government's theory of the case. Further, appellant argued that evidence of the plea agreement was relevant only if appellant attacked Harris for bias or motive in currying favor with the government. To that end, appellant offered to refrain from arguing that Harris was trying to curry fa-

---

**6.**  In his statement to police after the shooting, which Nicholson later said he could not remember, Nicholson said that appellant put

one hand on Young and fired the gun with his other hand.

vor with the government with his testimony.

The government responded that it did not want to appear to be keeping information from the jury and that the jury was entitled, in considering Harris' testimony, to know that he pled guilty, that the agreement required him to testify truthfully, and that he would receive benefits from the agreement. Further, the government did not want the jury speculating about Harris' fate or "assum[ing] that since [Harris] [was] testifying, [Harris] has got nothing." The trial court agreed, finding that the plea agreement was relevant to the jury's credibility determinations and that the jury could reasonably find either that the plea agreement undermined or bolstered Harris' testimony. The court denied appellant's motion *in limine* and held that the appropriate way of dealing with potential prejudice was with a limiting instruction.[7]

On appeal, appellant contends that because he "offered to forgo any bias impeachment of Harris based on his plea agreement[,]" there was no basis for the government to introduce or even refer to Harris' plea agreement which, appellant claims, improperly bolstered Harris' testimony. Thus, appellant asserts he was prejudiced by the denial of the motion *in limine* because, he contends, evidence of the plea agreement made it more likely that the jury would believe Harris' testimony instead of his initial statement to the police that he did not see the shooting.

We must determine whether the government may introduce evidence of a plea agreement with a government witness on direct examination where the defense has stipulated that it will refrain from cross-examination regarding bias relating to that plea agreement. This case is unlike the situations we have addressed in the past where the government sought to introduce evidence of the plea agreement on direct examination in anticipation of the defense's cross-examination regarding bias. Here, appellant argues that because he stipulated at trial that he would not cross-examine Harris regarding bias stemming from his plea agreement, the government had no basis for introducing the terms of the plea agreement which arguably bolstered Harris' testimony impermissibly.

We have held that "elicitation during *direct* examination of a plea agreement containing a promise to testify truthfully does not constitute impermissible bolstering of the witness' credibility." *Smith v. United States,* 687 A.2d 1356, 1367 (D.C. 1996) (emphasis added; internal quotation marks and citations omitted), *vacated by Smith v. United States,* 699 A.2d 348 (D.C. 1997), *and "reinstate[d]" by Smith v. United States,* 709 A.2d 78, 83 (D.C.1998).[8]

---

7. The jury instruction said, in part:

A witness who has entered into a plea agreement is under the same obligation to tell the truth as is any other witness because the plea agreement does not protect him against a prosecution for perjury or false statement should he lie under oath. However, you may consider whether a witness who has entered into such an agreement has an interest different from any other witness. A witness who realizes that he may be able to obtain his own freedom or receive a lighter sentence by giving testimony may have a motive to lie. The testimony of a witness who has entered into a plea agreement should be received with caution and scrutinized with care. You should give the testimony such weight as in your judgment it is fairly entitled to receive.

8. We first heard oral argument in *Smith* on October 18, 1995, and a panel of this court issued its decision on December 30, 1996. *See Smith v. United States,* 687 A.2d 1356, 1367 (D.C.1996). On June 18, 1997, we granted appellant's petition for rehearing *en banc* (to reconsider a different issue) and vacated the panel's decision. *See Smith v. United States,* 699 A.2d 348 (D.C.1997). Thereaf-

Appellant asserts that this case is unlike *Smith* because he offered to forgo questioning Harris about his potential bias and so, in this context, the government had no reason to introduce the plea agreement except for the impermissible purpose of bolstering the veracity of Harris' testimony. The government counters that blunting anticipated impeachment by the defense is only one purpose in admitting a plea agreement on direct examination, noting that evidence of a plea agreement also prevents the jury from speculating as to why a person whose testimony implicates him in the alleged crime has not been charged.

■ Contrary to appellant's assertion, we do not view the holding in *Smith* as turning upon whether the defense had planned to impeach the government's witness on cross-examination. While we noted that the defense in *Smith* had indicated that it intended to challenge the witness' testimony based on his plea agreement, we found that the admission of a plea agreement "does not constitute impermissible bolstering of the witness' credibility." *See Smith, supra,* 687 A.2d at 1367 (internal quotation marks and citations omitted). Before reaching that conclusion, we considered the rationale adopted by courts that prohibit the preemptive introduction (*i.e.,* before the witness' credibility is challenged) of a plea agreement's terms which require the witness to testify truthfully. *Id.* at 1365. Ultimately, however, we chose to adopt the D.C. Circuit's reasoning and we held that the admission of a plea agreement does not "suggest to the jury that special credence should be attached to the witness' testimony." *Id.* at 1366 (citing *United States v. Spriggs,* 302 U.S.App. D.C. 54, 58, 996 F.2d 320, 324 (1993)). We fail to see why the holding in *Smith*—that

the admission of a plea agreement on direct examination "[does] not constitute improper prosecutorial vouching for [the witness'] veracity"—should not apply with equal force here, irrespective of appellant's stipulation at trial to forgo cross-examination on the issue. *Id.* at 1367 (internal quotation marks and citations omitted); *see, e.g., United States v. Richardson,* 421 F.3d 17, 40 (1st Cir.2005) (holding that a party may "preemptively impeach" its own witness, "even where the defendant agrees to forego [sic] impeachment on cross-examination"); *United States v. Universal Rehab. Servs. (PA), Inc.,* 205 F.3d 657, 666–67 (3d Cir.2000) (*en banc*) (guilty pleas and plea agreements were admissible even though defendants "promised, through their motions in limine, not to attack [the witnesses'] credibility"); *United States v. Montani,* 204 F.3d 761, 765–67 (7th Cir.2000) (same). We will follow that rule here, where "there is nothing in the agreement or in the prosecutor's direct examination on that subject to 'imply that the government had special knowledge' of the witness's veracity." *Spriggs, supra,* 302 U.S.App.D.C. at 58, 996 F.2d at 324 (citing *United States v. Henderson,* 717 F.2d 135, 138 (4th Cir.1983)).

Appellant argues that the jury could have found the plea agreement a decisive factor in crediting Harris' testimony. But equally likely is the possibility that the jury could have found such testimony suspect precisely because it was elicited subject to a plea agreement. *Smith, supra,* 687 A.2d at 1366. This "double-edged sword" makes it hard to conclude that either party was prejudiced or favored over the other by admission of the plea agreement. Further, although it is true that the witness *could* face more serious charges and additional time in prison if he

ter, on March 26, 1998, we issued the *en banc* opinion, *Smith v. United States,* 709 A.2d 78,

83 (D.C.1998), which "reinstate[d]" the initial panel decision.

did not cooperate with the government, it is also true that he *would* face similar consequences if he perjured himself at trial, regardless of whether the lie was to the benefit of the appellant or the government. *See, e.g.,* D.C.Code § 22–2402(a)(1) (2001); *see also Smith, supra,* 687 A.2d at 1366 ("Given this two-sided nature of the issues raised by [plea] agreements, which must be resolved ultimately by the jury, admission of the agreements specifying the consequences of perjury are not considered impermissible bolstering of the witness' testimony.").

On this record, we cannot say that the trial court abused its discretion in finding that the plea agreement was relevant. *See Lazo v. United States,* 930 A.2d 183, 185 (D.C.2007); *Brown v. United States,* 932 A.2d 521, 525 (D.C.2007) (evidentiary determinations are within the sound discretion of the trial judge, who may find that evidence is admissible if a fact is slightly more relevant with the evidence than without it). Nor can we say that the trial court abused its discretion in concluding that the plea agreement's probative value was not substantially outweighed by the danger of unfair prejudice. *See Johnson v. United States,* 683 A.2d 1087, 1099 (D.C.1996) (*en banc*). As the government notes, for example, evidence of the plea agreement also serves to extinguish jury speculation about why a particular witness who is connected to the crime is not being charged.

It was within the trial court's discretion to permit the jury to weigh the effect of the plea agreement on Harris' veracity. *Brown, supra,* 932 A.2d at 525. By admitting the plea agreement, the jury could consider all the facts underlying Harris' testimony and make its own credibility determinations. *Id.* Indeed, the "introduction of the entire plea agreement permits the jury to consider fully the possible conflicting motivations underlying the witness' testimony and, thus, enables the jury to assess more accurately the witness' credibility." *Smith, supra,* 687 A.2d at 1366 (quoting *United States v. Townsend,* 796 F.2d 158, 162 (6th Cir.1986)). Furthermore, as mentioned above, the trial court sought to mitigate potential prejudice to appellant by instructing the jury that "[t]he testimony of a witness who has entered into a plea agreement should be received with caution and scrutinized with care." See note 7 *supra.* In sum, because the probative value of the plea agreement was not substantially outweighed by the danger of unfair prejudice, we cannot say that the trial court abused its discretion by denying appellant's motion *in limine* to exclude evidence of Harris' plea agreement.

**B. *Appellant's Inconsistent Statements***

■ During direct examination of appellant, defense counsel elicited the fact that appellant was interviewed by the police on the day after the shooting. When counsel asked appellant what he told the police, the government objected on the grounds that it was hearsay and the trial court sustained the objection. Appellant was permitted to testify on direct examination only that he lied to the police and why he lied, but he was prevented from explaining the *content* of the lies to the police. On cross-examination, however, the government asked appellant what he told the police. Appellant moved for a mistrial on the grounds that the court prevented him from asking the same exact line of questioning, arguing that the ruling prevented defense counsel from "tak[ing] the sting out of [appellant's lies]" and instead made it look as if the government were exposing appellant. On appeal, appellant argues that the court abused its discretion and that the court's error was not harmless.

As the government concedes, the trial court erred in excluding as hearsay appel-

lant's testimony about the lie he initially told the police because it was not being introduced for its truth. *See, e.g., Peyton v. United States,* 709 A.2d 65, 74 n. 21 (D.C.1998). The government argues, however, that this error was harmless because appellant admitted that he lied to the police and so all that was excluded was the specific content of the lie. Further, the government argues that appellant's credibility as a witness did not affect the verdict because of the weight of the other evidence against him.

We have held that a party is entitled to " 'bring out on direct examination damaging information about ... his witness.' " *Reed v. United States,* 452 A.2d 1173, 1179 (D.C.1982) (quoting *Kitt v. United States,* 379 A.2d 973, 975 (D.C.1977)). Here, appellant sought to reconcile his early statements to the police (that he did not see the shooting) with his later, inconsistent testimony at trial (that he shot Young in self-defense) so that he could preemptively "take the sting out" of the government's anticipated impeachment during cross-examination. His strategy was thwarted by the trial court, however, and the trial court erred when it prevented appellant from testifying on direct about the content of his lie. *Reed, supra,* 452 A.2d at 1179.

We must determine next whether or not the error was harmless. Under the harmless error standard set forth in *Kotteakos v. United States,* we must be able to say "with fair assurance ... that the judgment was not substantially swayed by the error." 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (U.S.1946).[9] "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Id.; see also Kitt, supra,* 379 A.2d at 975 (finding a jury's evaluation of the credibility of several witnesses would not have changed had it known about their prior convictions). In this case, when measured against the remaining evidence, we can conclude with fair assurance that the effect of the error was not substantial. Indeed, permitting appellant to explain the content and specific details of his lie to the police during his direct examination would have had a minimal effect on the jury's evaluation of appellant's credibility.[10]

Appellant contends that by preventing him from "taking the sting out" on direct,

9. The error here does not have constitutional implications that require a higher standard of review. "In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." *United States v. Havens,* 446 U.S. 620, 627, 100 S.Ct. 1912, 64 L.Ed.2d 559 (U.S.1980).

10. The evidence against appellant included Nicholson's testimony that appellant approached Young from behind, and that there was little time for Young to react before appellant shot him. Also, Harris testified that in reacting to appellant, Young only made a slight movement and looked as if he were about to flee before appellant shot him in the head. Finally, appellant testified that the event that triggered the shooting was when Young "lifted up his shirt and reached for pistol like he done earlier." Even judged in the light most favorable to appellant's claim of self-defense, there is no dispute that after the mugging, appellant failed to contact the authorities; instead, he deliberately armed himself, approached Young from behind, and shot him in the side of the head (from less than two feet away). As the jury was instructed, "if ... the defendant was the aggressor or if he provoked the conflict upon himself, he cannot rely on the right of self-defense to justify his use of force. One who deliberately puts himself in a position where he has rea-

the jury got the impression that appellant was trying to hide the untrue version he told the police and that it took extensive cross-examination by the government to uncover the content of his lies. We disagree. As the government notes, the jury was present to observe that appellant wanted to explain himself on direct examination but he was precluded from doing so because the prosecutor objected and the court (erroneously) sustained the objection. Especially since the jury witnessed this exchange, we find it unlikely that it believed that appellant was trying to hide the content of what he told the police. In any event, whether the jury knew simply that appellant lied to the police or whether it knew the details of the lie, we find that the effect of the error was not so substantial as to have swayed the verdict. *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239. Thus, we conclude that the error was harmless.

### III.

In sum, we affirm appellant's convictions for the reasons stated above because (a) we cannot say that the trial court abused its discretion when it denied appellant's motion *in limine* to exclude Harris' plea agreement, even though appellant stipulated that he would not cross-examine Harris regarding bias; and (b) while the government concedes that the trial court erred in preventing appellant from testifying about the content of appellant's inconsistent statements to police, the error was harmless.

Accordingly, we *affirm.*

*So ordered.*

son to believe that his presence will provoke

trouble cannot claim self-defense."