7 A.3d 169

**Kevin ARMSTEAD a/k/a Kevin Armstaed**

v.

**STATE of Maryland.**

**No. 469, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 28, 2010.

**600**

Michael R. Braudes (Paul B. DeWolfe, Public Defender, on
the brief), Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: *DAVIS, HOLLANDER, JAMES A. KENNEY, III (Retired, Specially Assigned) JJ.

JAMES A. KENNEY, III, J. (Retired, Specially Assigned).

Appellant, Kevin Armstead a/k/a Kevin Armstaed, was indicted in the Circuit Court for Baltimore City and charged with conspiracy to commit murder, murder, use of a handgun in commission of a felony and crime of violence, and wearing, carrying and transporting a handgun. A jury acquitted appellant of first degree murder and the handgun offenses, but convicted him of second degree murder and conspiracy to commit murder. The court then sentenced appellant to thirty years for second degree murder and to a consecutive sentence of life for conspiracy to commit murder. Appellant timely appealed and presents the following questions for our review:

I. Did the trial court fail to properly exercise discretion and/or abuse its discretion in refusing to order a presentence investigation report and in proceeding to sentencing immediately following verdict despite defense counsel's assertion that she needed time for preparation?

II. Does the record fail to reflect that Appellant was convicted of conspiracy to commit murder in the first degree?

III. Did the trial court err in excluding evidence of Jamal Fulton's plea agreement and that he testified at a trial at which he testified inconsistently with the account of Leroy Simon in the present case?

IV. Did the trial court err in admitting evidence that a key State's witness had been threatened and in denying a related motion for mistrial?

---

* Arrie W. Davis, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

V. Was the evidence legally sufficient to sustain a conviction for conspiracy to murder?

For the following reasons, we shall affirm the judgment of the circuit court.

## BACKGROUND

On March 20, 2007, Ricardo Paige was found lying dead on the living room floor of his residence at 502 East 43rd Street in Baltimore City, Maryland, having suffered multiple gun shot wounds. He was discovered by his daughter, Deneen Woods, and his grandson, Ricardo McDonald.

Woods testified at trial that she had seen appellant, also known as "Muggs," on the block on prior occasions with Fulton, who she knew as "Nube," and with Trendon and Tremaine Washington, twin brothers, both of whom she knew as "Twin." Fulton lived in the house next door, 500 East 43rd Street. Drugs were a "big problem" with Fulton. On the Friday before Woods's father was murdered, Fulton came to 502 East 43rd Street and argued with Paige. Fulton told Woods that her father was "making his spot hot." Woods responded by telling Fulton that she did not want any drugs to be around her father, and Fulton replied that "he would not say nothing else to [her] dad."

At some point after Paige's death, Woods spoke to a person in the neighborhood she knew as "Lurch." Lurch provided Woods with some information, and Woods conveyed that information to Detective James Lloyd.

Leroy Simon testified that he is known as "Lurch" and that he knew Paige through Woods. In late March 2007, intending to exchange drugs for sex, he was with a woman behind the victim's residence. At that time, he saw appellant, Fulton, known to him as "Nuke," and "Twin" and another unidentified individual near Paige's house.

He observed appellant go into Paige's house first, and then he heard some "tussling." A few minutes later, he saw "Twin" enter the house. Fulton went inside the residence as well.

The unidentified person remained outside the residence where he was giving orders.

After appellant, Fulton, and "Twin" were inside, Simon heard gunshots. He then heard sounds as if someone was sweeping up some glass and then saw the trio emerge from the residence.

Simon knew both Tremaine and Trendon Washington, and was aware that one of them was incarcerated at the time. He identified a photograph of Trendon Washington as the person he was referring to as "Twin" in his testimony.

After Simon testified that he spoke to Detective Lloyd on three occasions, the State sought to refresh his recollection with a statement, but Simon testified that he could not read or write. Because there was some confusion about whether Simon ever told police that he saw Fulton enter the residence, the jury was excused, and the tape of Simon's third interview was played to refresh Simon's recollection.

After the jury returned, Simon testified that Fulton was standing outside of the house and actually never went inside. Simon admitted he had made a mistake earlier during his testimony when he said Fulton had gone inside.

Simon continued his testimony as follows:

While appellant, "Twin" (Trendon Washington), and an un-identified third person were inside the residence, Simon heard tussling. After he heard these sounds, Fulton, "who remained outside, hollered, 'handle your business.'" Simon then heard two to three gunshots. After the shooting, Simon saw all four individuals run from the residence.

Simon identified a photo of appellant as a person who was present at the crime scene and had entered the residence. He also identified both Tremaine and Trendon Washington, distin-guishing between them and identifying Trendon Washington as the twin present at the scene. Simon was originally unable to identify the person who remained outside the residence, but, after refreshing his recollection, recalled that during the third interview with police, he identified a photograph of

Fulton, indicating that he was the one who stayed outside and "gave orders."

Asked why he did not go to the police earlier, Simon stated: "It ain't good to snitch, it ain't good to snitch. Snitchers get stitches, that's how I always looked at it." However, when he learned that the victim was Wood's father, Simon decided to come forward. He learned two days after he saw the individuals at Paige's residence that Paige had died.

On cross-examination, Simon testified that he had not testified in the trial involving Trendon Washington and that he was incarcerated when he first spoke to Detective Lloyd about this case.

Detective Chris Glanville testified that he encountered appellant, and both Trendon and Tremaine Washington, on April 28, 2007. At that time, he recovered a loaded .45 caliber Springfield nineteen eleven model firearm from Trendon Washington. All of the bullets recovered in this case were .45 auto caliber. The ballistics evidence was compared to the recovered firearm, and two of the cartridge casings recovered from the crime scene were fired from that pistol. Other bullet specimens could neither be identified nor eliminated as being fired from the recovered gun. However, three of the five bullets recovered in this case were fired by the same firearm, while the two remaining bullets lacked proper markings for comparison.

Detective Lloyd testified that Trendon Washington, Fulton, and appellant were arrested in connection with this case. Appellant was arrested in Decatur, Georgia, where he gave the name "James L. Jefferson." When appellant was interviewed on April 10, 2008, the parties stipulated that appellant stated: "I already looked up the case. Why am I not just charged with conspiracy, what about the other three?" The charging documents at that time did not mention conspiracy. Also, Detective Lloyd testified that he had never told appellant about a conspiracy charge or that there were three other people involved in the crime.

Detective Lloyd testified that he was aware that DNA evidence had been collected at the crime scene, but the parties stipulated that all of that evidence came back as being consistent with the victim's DNA. Latent fingerprints recovered from the crime scene were also consistent with being from the victim. Additionally, a search warrant was obtained for appellant's home and nothing was recovered from that search relating to this investigation.

The State's last witness was the medical examiner, Dr. Theodore King. According to Dr. King, Paige died of multiple gunshot wounds, and the manner of death was homicide. He could not pinpoint the exact time of death.

After the State rested, defense counsel called Fulton. Fulton testified that he knew appellant and that he knew him by the name of "Muggs." Fulton used to live at 500 East 43rd Street in Baltimore City, "[u]p to prior to [his] arrest" in 2007. Paige, who Fulton knew as "Poppy," lived next door at 502 East 43rd Street. Fulton also knew Woods, Woods's son, Ricky, and Simon, also known as "Lurch." Fulton stated that he was originally charged with Paige's murder.

Fulton testified that, on March 18, 2007, Trendon Washington called and asked Fulton to drive him to the "vial store." Trendon Washington sold drugs, including crack and marijuana, and usually stored his drugs in a vacant house located nearby at 508 East 43rd Street. Fulton, along with appellant, accompanied Washington to the store to buy vials so he could package his drugs.

When they returned, Fulton parked in front of 508 East 43rd Street while Washington went inside. Moments later, Washington emerged and angrily informed them that his drugs were missing and that the back door to that location had been knocked down. Recalling that Paige was outside when the three of them left to go to the "vial store," Washington and appellant then went to Paige's home, while Fulton remained with his car.

Trendon Washington engaged Paige in a conversation, but Fulton could not hear what they were saying. After that

conversation, Washington and appellant returned to Fulton's car, and Washington said, "I'm going to go do that." Fulton understood this to mean that Washington was going to beat and then kill Paige.

Fulton testified that he saw Trendon Washington the next day, but he did not mention Paige or the drugs. Fulton then saw Trendon Washington again, on March 20, 2007, at around noon or 1:00 p.m., and Fulton asked him where Paige was because he had not seen him in two days. Washington replied, "I done what I said I was going to do." Fulton understood this to mean that Washington had killed Paige. Around 5:00 or 6:00 p.m. that same day, Fulton learned that Paige was dead.

Fulton further testified that he had seen Trendon Washington carry a .45 caliber semi-automatic handgun on prior occasions, including in January and February of 2007. Fulton described the gun, and then identified State's Exhibit 6A as Trendon Washington's gun.

On cross-examination by the State, Fulton confirmed that he was not present at the time of the murder, and, further, that Trendon Washington did not provide him with any details of what he had done. Nor did Washington tell Fulton if he was with anyone at the time of the murder.

We shall include additional facts in the discussion of the issues presented.

## DISCUSSION

### I.

Appellant first contends that we should remand this case for a new sentencing hearing because the trial court failed to exercise any discretion when it denied his request to order a pre-sentence investigation ("PSI"). The State responds that, even if the court erred, the record demonstrates that any error was harmless beyond a reasonable doubt. Considering the record as a whole, we agree with the State.

After the jury returned its verdict convicting appellant of second degree murder and conspiracy to commit murder, the following ensued:

THE COURT: All right, counsel, are we ready for sentencing?

[DEFENSE COUNSEL]: Your Honor, we would request a PSI.

THE COURT: Denied. I think what I need to know to sentence in this case, [defense counsel], is anything good you can tell me about him, but I've heard this case. I want to see the sentencing guidelines. I want to hear about his prior record. I want to hear anything good you can tell me about him. Do you have the sentencing guidelines computations [prosecutor]?

The State then informed the court that he had calculated the guidelines and shown them to defense counsel. Those guidelines called for a range of sentencing for second degree murder between twenty to thirty years, and, for conspiracy, between thirty years to life imprisonment. Defense counsel could not agree with those guidelines because she did not prepare guidelines herself. The court replied: "Well if you disagree get back to me subsequently."

Both parties then agreed that appellant was previously convicted of attempted second degree murder in 1998, and had received a sentence of ten years, with all but five suspended. Appellant had also been convicted of a deadly weapon charge, although it was unclear whether that was for use of a deadly weapon or carrying a deadly weapon. Appellant was also convicted of third degree sexual offense, as well as breaking and entering, but neither defense counsel nor the State knew what the sentence was on those convictions.

The court then asked defense counsel appellant's age, and, after defense counsel replied that appellant was twenty-six years old, defense counsel asked if the court was going to sentence at that time. The court replied in the affirmative, stating that it was within the court's discretion whether to order a PSI. Counsel then indicated that she was not prepared

for sentencing because she did not bring her folder containing appellant's file. After counsel also indicated that she could not have someone bring her the file, the court replied:

Well, with the crowded dockets we have and the re-sources we have, I think sentencing is appropriate now. If you want to file anything with me for reconsideration, I'll certainly be glad to consider it, but what can you tell me good about your client?

Counsel then asked for and was granted a brief recess to retrieve her file folder. When defense counsel returned to the courtroom, she began by moving to strike the second degree murder verdict on the grounds that it was inconsistent with the jury's acquittal on the handgun charges. Counsel stated, "absent an instrument, it would seem to me how could the second degree verdict survive." The court denied the motion, indicating that counsel did not make this motion prior to excusing the jury.

Defense counsel then noted that she had a right to file a motion for new trial within ten days of the verdict, and, by immediately proceeding to sentencing, the court was denying appellant the opportunity to file such a motion. The court disagreed, observing that appellant could file all post-trial motions after sentencing.

Defense counsel then objected to sentencing without a PSI, stating that appellant "should have an opportunity to prepare information for the Court, information in mitigation, including having individuals testify on his behalf, and the Court is denying him the right to do that." After the court stated that appellant could testify on his own behalf, defense counsel then stated, "I just have not had the experience in my 28 years of asking for a PSI and not getting it in a case of this magni-tude." It was at this point that the trial court stated:

I can tell you, I haven't been here 28 years, but I have been on this job a couple of years and I have always sentenced as soon as the verdict comes in. I have never ordered a PSI, and I guess I shouldn't say this but I will, the only PSI I had was one that was mandatory because it

was a life without parole. And I must tell you it didn't help me at all. I mean it was just blabber that he had a grandmother who loved him and, you know, things like that, that you can proffer to me. So while it would be fine to hear from the people, I'll accept your proffer as to what they would have to say on behalf of Mr. Armstead. So what else?

Defense counsel then informed the court that appellant was twenty-six years old, had an eighth grade education, and received his GED in 1999. Appellant worked for two different companies between 2002 and 2004, and stopped working when his mother passed away in 2004. Appellant's father was alive, but was suffering from a kidney ailment. Appellant was not married and had no children. He did not suffer from any physical or mental disabilities. He was not taking any medications, but was addicted to drugs and alcohol.

With respect to his prior convictions, defense counsel could find no reference to a prior breaking and entering, and the court replied, "Then I won't consider it." The prior sex offense case from 1998 began as a juvenile matter and was transferred to adult court. The prior attempted second degree murder dated from February 1999, where appellant was sentenced to ten years, with all but five suspended, followed by four years of probation.

The court then heard from appellant's aunt, Tasheena Washington, who informed the court that appellant was "easy going, he is quiet, he is a playful individual." Appellant had had a "hard life" and "he was scared." With respect to the sex offense conviction, Ms. Washington informed the court that the incident involved her niece. According to Ms. Washington, after the niece's mother gave her to her father, the niece thought that "if she would lie[,] that my sister would take her back and she didn't." Ms. Washington also stated that appellant told his grandmother he never touched the niece.

Appellant then addressed the court, declaring that, when he was fifteen, he carried a gun and shot someone. He confessed

to that crime and did his time, stating: "I admitted to my mistakes." After he came home, appellant stated, "sometimes you just, like you get caught in stuff that you really don't have nothing to do with, and I just, I guess sometimes you pay for the decision of the twelve people you pick on the jury." Appellant then asked for leniency. After appellant concluded, defense counsel then informed the court that she had nothing else to tell the court.

The court then stated that it was not considering the breaking and entering, and that it was not attaching any significance to the sex offense conviction based on the fact that appellant was "on the cusp of being a juvenile himself[.]" The court then indicated that this was a "horrible" case and that he agreed with the jury's verdict, "except I think it was a first degree murder case and I think they showed leniency." Appellant was then sentenced to thirty years for second degree murder and to a consecutive sentence of life for conspiracy to commit murder. Defense counsel concluded the proceeding by informing appellant of his post-trial rights, including the right to file: a motion for new trial, an appeal to this Court, a request for review of sentence by a three-judge panel, and a request for a modification of sentence.[1]

Appellant acknowledges on appeal that the decision of the circuit court of whether to order a PSI is a discretionary one. *See* Md. Rule 4–341 ("Before imposing a sentence, if required by law the court shall, and in other cases may, order a presentence investigation and report."); Md.Code (1999, 2008 Repl.Vol.) § 6–112(b) of the Correctional Services Article (providing that a presentencing investigation report is allowed if the court is satisfied it would help, and the party requesting

---

1. The record discloses that appellant filed a motion for new trial within ten days of the sentencing, and, although the substance of that motion is not included with the record on appeal, that motion was denied by the trial court. Appellant also filed a motion for modification and/or reduction of sentence with the trial court, and an application for review of sentence by a three judge panel. Although these documents also are not included in the record on appeal, we note that the three judge review panel left the sentence unchanged. The record does not reveal any resolution of the motion for modification filed with the trial court.

the report has the burden of establishing that the investigation should be ordered); *Sample v. State,* 33 Md.App. 398, 406, 365 A.2d 773 (1976) ("Whether or not a court orders a presentence investigation in a particular case is within the discretion of the court"). Moreover, this Court has indicated that the trial court is not required to consider information in a PSI prior to sentencing. *See Church v. State,* 5 Md.App. 642, 646, 248 A.2d 907 ("There is no requirement under Maryland Rule 761(c) that the trial judge is required to make use of a presentence report.").

▉▉▉ Appellant argues that, by stating it had "never ordered a PSI," the trial court followed a "hard and fast rule" that demonstrated failure to exercise discretion. When a trial judge has discretion in making a decision, "he must use it and the record must show that he used it." *Nelson v. State,* 315 Md. 62, 70, 553 A.2d 667 (1989) (holding that court's refusal to order a PSI was erroneous). When a trial judge acknowledges that he has the right to exercise discretion, but chooses instead to follow "some consistent or uniform policy," he has acted erroneously. *Hart v. Miller,* 65 Md.App. 620, 627, 501 A.2d 872 (1985), *cert. denied,* 305 Md. 621, 505 A.2d 1342 (1986); *see also Maddox v. Stone,* 174 Md.App. 489, 502, 921 A.2d 912 (2007) ("[T]he record must reflect that the judge exercised discretion and did not simply apply some predetermined position.").

In *Somers v. State,* 156 Md.App. 279, 846 A.2d 1065, *cert. denied,* 382 Md. 347, 855 A.2d 350 (2004), defense counsel requested a PSI, and that request was denied, with the only comment from the court being, "We will sentence today." *Id.* at 318, 846 A.2d 1065. This Court concluded that the circuit court did not abuse its discretion in so ruling "because Somers offered nothing to show a need for a presentence investigation." *Id.* at 319, 846 A.2d 1065. We further observed that there was nothing in the record to establish that the court failed to exercise discretion. For instance, "[t]he court did not say or do anything to show that it was acting in a rote fashion, out of a routine that did not depend on the particulars of the

given case." *Id.* Instead, the record established that the court exercised its discretion because "no showing was made to support it." *Id.*

By contrast, in this case the trial court clearly stated that it never ordered a PSI except in a case where it was mandatory to do so. Thus, it appears the court was "acting in a rote fashion," and failed to exercise any discretion in deciding whether to order a PSI on a case by case basis. For that reason, we shall assume, for the purposes of this opinion, that the trial court's refusal to order the PSI was an abuse of discretion.

However, under the circumstances of this case, we are persuaded that the error was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) (error will be harmless when reviewing court, upon independent review, is able to declare a belief beyond a reasonable doubt that there is no reasonable possibility that the error contributed to the verdict); *see also Scott v. State,* 289 Md. 647, 655, 426 A.2d 923 (1981) (considering, but ultimately rejecting, State's argument that trial court's error in meeting *ex parte* with a representative of a medical office and hearing a recommendation as to sentencing was harmless error); *Conyers v. State,* 354 Md. 132, 161, 729 A.2d 910 (in a capital murder case, stating "that any alleged error did not affect the outcome of the sentencing proceedings and was harmless beyond a reasonable doubt"), *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *King v. State,* 300 Md. 218, 232, 477 A.2d 768 (1984) (failure of State to file notice of its intent to seek enhanced penalties at sentencing was harmless error under the circumstances); *Brown v. State,* 11 Md.App. 27, 34, 272 A.2d 659 (although court erred by sentencing without hearing allocution, the error was harmless under the facts of this case because, immediately after sentence, counsel argued in mitigation of sentence, and the record showed that the trial court gave careful consideration to that argument), *cert. denied,* 261 Md. 722 (1971).

Here, the record as a whole establishes that appellant was not prejudiced by the failure of the court to order a PSI or to delay sentencing beyond the time necessary for defense counsel to retrieve her files. The court learned, through both the State and defense counsel, about appellant's prior convictions. Defense counsel also informed the court about appellant's education, employment history, and family life, including his addiction to drugs and problems with alcohol. Appellant's aunt also addressed the court and offered further information concerning the circumstances of one of appellant's prior convictions. Finally, appellant was given an opportunity to address the court and ask for leniency.

After hearing all of this evidence, the court indicated that either it would not consider certain of appellant's prior convictions or it would give them little significance in sentencing. The court then indicated that this was a "horrible" crime that could have resulted in a first degree murder conviction, and this appears to be the basis for its sentencing decision. Finally, as the State notes, defense counsel was informed that she could "file anything with me for reconsideration," and that the court would consider such information. Appellant did file a number of post-trial motions, and, although we have not been provided with the substance of those motions, we note that there also is no suggestion by appellant on appeal that the court abused its discretion or erred in denying those post-trial motions, or that appellant brought information to the court's attention that would have affected the sentence in his favor.

Accordingly, we agree that, under the circumstances of this case, the error was harmless beyond a reasonable doubt.

## II.

Appellant next asserts that the trial court's instructions permitted him to be convicted of conspiracy to commit murder without a finding that the agreement was to commit murder in the first degree. Recognizing that this Court had dealt with a similar issue in *Alston v. State,* 177 Md.App. 1, 934 A.2d 949 (2007), a case pending in the Court of Appeals on *certiorari* review at the time appellant filed his brief in this

case, appellant maintains: that the instruction amounted to plain error; that there was an ambiguity in the verdict; that the life sentence was illegal; and, finally, that our decision in *Alston* was wrongly decided.

The State responds that this Court "rejected this same contention in *Alston* [.] " The State further observes that, after appellant filed his initial brief in this case, the Court of Appeals affirmed our decision in *Alston*. *See Alston v. State,* 414 Md. 92, 994 A.2d 896 (2010). The State suggests that we follow *Alston* because appellant did not object to the jury instruction, the instruction does not constitute plain error, and because "[t]he merits of Armstead's claim are, moreover, indistinguishable from those of *Alston,* and should be rejected."

Alston was convicted of conspiracy to commit murder, but the jury returned not guilty verdicts on charges of first-degree murder, second-degree murder, and handgun charges. *Alston,* 177 Md.App. at 9, 934 A.2d 949. Alston raised four challenges to his convictions on appeal, one of which being that the trial court erred in sentencing him to life imprisonment when the jury could have found him guilty of conspiracy to commit second-degree murder. *Id.* at 9–10, 934 A.2d 949. The trial court, in *Alston,* instructed the jury first as to the crime of conspiracy consistent with the pattern instruction for conspiracy. *Id.* at 34, 934 A.2d 949. *See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:08, at 167 (1995) ("MPJI–Cr"). Specifically, the court instructed:

> The Defendant is charged with the crime of conspiracy to commit murder. Conspiracy is an agreement between two or more person [sic] to commit a crime. In order to convict the Defendant of conspiracy, the State must prove ... that the Defendant entered into an agreement with at least one other person to commit the crime of murder and that the Defendant entered into the agreement with the intent that that crime be committed.

*Alston,* 177 Md.App. at 34, 934 A.2d 949.

The trial court then gave the pattern instruction on first degree premeditated murder and second degree specific intent

murder. *Id.* at 34–35, 934 A.2d 949. *See* MPJI–Cr 4:17 at 217–18. Alston offered no objection to the instructions. *Alston*, 177 Md.App. at 40, 934 A.2d 949. Thereafter, the jury convicted Alston of conspiracy to commit murder, but did not convict on either murder charge. In sentencing Alston, the trial court "concluded that 'no reasonable jury could have found conspiracy to commit second degree murder on these facts;' " thus, it imposed a life sentence. *Id.* at 35, 934 A.2d 949. Alston moved for a new trial on the ground that "the conspiracy to murder instruction was not specific as to whether the conspiracy was to commit first or second degree murder." *Id.* The court denied Alston's motion "reasoning that conspiracy to murder, by definition, must be conspiracy to commit first degree murder[.]" *Id.*

On appeal, this Court concluded:

> To be sure, it is conceivable the jury may have been improperly led to believe from the instruction that it could convict Alston of conspiracy to commit second degree murder without finding a specific intent to kill. A proper instruction would have informed the jury that it could only convict Alston for conspiracy to commit first degree murder or that the specific intent to kill was required. But Alston failed to timely object to the instruction, as Md. Rule 4–325(e) requires:
>
>> No party may assign as error the giving or the failure to give an instruction unless the party on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.
>
> Alston's failure to challenge the jury instruction in accord with Md. Rule 4–325(e) now bars his asserted assignment of error.

*Id.* at 40, 934 A.2d 949.

The Court of Appeals affirmed our decision, agreeing that Alston failed to preserve his challenges to the court's instructions. *Alston*, 414 Md. at 111, 994 A.2d 896. Alternatively, the Court observed that, " . . . even if we exercise our discre-

tion under Maryland Rules 4–325(e) and 8–131(a) and excuse the defendant's failure to object to the instructions, the result would not be different." *Id.* at 112, 994 A.2d 896. The Court rejected Alston's contention that, if properly instructed, the jury could have found him guilty of conspiracy to commit second-degree murder, because, "[u]nder Maryland law, there can be no such thing as a conspiracy to commit second degree murder of the intent-to-inflict grievous bodily harm variety." *Id.* at 112–13, 994 A.2d 896.

The Court explained that, under *Mitchell v. State*, 363 Md. 130, 140, 767 A.2d 844 (2001), "there [is] no such crime in Maryland as conspiracy to commit second degree murder based upon an intent to kill but without deliberation and premeditation ..." because " 'the kind of awareness and reflection necessary to achieve the unity of purpose and design for a conspiracy is essentially the same as that required for deliberation and premeditation.' " *Id.* at 113, 994 A.2d 896 (quoting *Mitchell*, 363 Md. at 149, 767 A.2d 844). In addressing the question left open by *Mitchell*, the Court recounted its analysis of the intent to inflict grievous bodily harm variety of second-degree murder as iterated in *Thornton v. State*, 397 Md. 704, 714, 919 A.2d 678 (2007).

"Murder of the intent-to-inflict-grievous-bodily-harm type is, by definition, a specific intent crime, even though there is no conscious or purposeful design to kill the victim. *Fisher* [*v. State* ], 367 Md. [218,] 274 [786 A.2d 706 (2001) ]. In *Glenn* [*v. State* ], 68 Md.App. [379,] 390 [511 A.2d 1110 (1986) ], the intermediate appellate court acknowledged that '[t]he critical distinction that needs to be made ... is between *the results specifically intended, not between the presence or absence of a specific intent.* Although there is the purpose or design that the victim should suffer serious physical harm, there is no necessary purpose or design that the victim should die.' (citations omitted). *See also*, [Judge Charles E. Moylan, Jr., *Criminal Homicide Law*, 95 (2002) ]. (The difference between specific intent-to-kill murder and specific intent to commit grievous bodily harm is in the result specifically intended.)."

*Alston,* 414 Md. at 116, 994 A.2d 896 (quoting *Thornton,* 397 Md. at 731–32, 919 A.2d 678; emphasis in *Thornton* ) (footnote omitted). According to the Court:

> It is clear from *Thornton* that the intent-to-inflict-griev-ous-bodily-injury variety of second degree murder does not involve an intent to kill. An intent to murder, however, means an intent to kill with malice. *State v. Earp,* 319 Md. 156, 163–164, 571 A.2d 1227, 1231 (1990); *State v. Jenkins,* 307 Md. 501, 514–515, 515 A.2d 465, 471–472 (1986). And a conspiracy to murder means a malicious intent to kill with deliberation and premeditation, *i.e.,* first degree murder, as the conspiracy necessarily supplies the elements of delibera-tion and premeditation. *Mitchell v. State, supra,* 363 Md. 130, 767 A.2d 844. Consequently, a charge of conspiracy to murder logically excludes second degree murder based upon an intent to inflict grievous bodily harm. The intent ele-ments of each offense are entirely separate and distinct.

*Id.* at 116–17, 994 A.2d 896.

In this case, the trial court's instructions were nearly identi-cal to those given during Alston's trial. The trial court first gave the pattern instruction on first degree premeditated murder and second degree specific intent murder. *See* MPJI–Cr 4:17, at 217–18. The court then gave the pattern instruc-tion on conspiracy, stating generally that appellant was charged with conspiracy to commit the murder of Mr. Paige. *See* MPJI–Cr 4:08, at 167. The trial court further stated, consistent with the pattern instruction, that the State was required to prove "that the defendant entered into an agree-ment with at least one other person to commit the crime of murder, and the defendant entered into that agreement with the intent that murder be committed."

Like *Alston,* appellant failed to lodge an objection to the court's instruction and expressly stated, "No exceptions." Al-though appellant urges us to exercise our discretion under Md. Rule 4–325(e) to take cognizance of this alleged "plain error," we decline appellant's invitation in light of the Court of Appeal's recent holding in *Alston,* 414 Md. at 92, 994 A.2d 896.

Accordingly, we need not address appellant's remaining arguments on this issue as it is clear that, in Maryland, there can be no conspiracy to commit second-degree murder and, therefore, it was not error for the trial court to omit an instruction to the jury explaining that there can be no conspiracy to commit second-degree murder.[2]

### III.

■ Next, appellant contends that "a recurring issue at trial was whether the defense would be permitted to adduce evidence to establish that the State, in two separate trials of the same event, pressed two very different and to some extent contradictory versions of the events." In that regard, appellant maintains that the court erred in excluding evidence of Fulton's plea agreement with the State. The State responds that the trial court properly exercised its discretion in excluding this evidence. As we will explain in more detail, while evidence of Fulton's plea agreement was arguably admissible to challenge Simon's credibility, we are persuaded that the circuit court did not abuse its discretion in excluding this evidence under Rule 5–403.

Prior to trial, appellant moved to preclude Simon's testimony on the grounds that he was being denied due process based on the alternative theories of the case put forward by the State, and because there was an alleged discovery violation with respect to Fulton.[3] According to appellant: "[I]n the instant case, the State called as its principal witness Leroy Simon, who averred that Jamal Fulton was a major partici-

---

**2.** We note that appellant also argues there was error under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court addressed a similar claim in *Alston,* and concluded that *Apprendi* "dealt with an enhanced sentencing law," and was inapplicable because "Alston was not given an enhanced sentence beyond that statutorily called for in the case of conspiracy to commit first degree murder." *Alston,* 177 Md.App. at 36–37, 934 A.2d 949. We see no reason to reach a different result in this case.

**3.** On appeal, appellant does not maintain that there was any discovery violation.

pant, and quite possibly the ringleader, in the murder of Ricardo Paige," but

> [i]n the trial of Trendon Washington, by contrast, the State entered into a plea bargain with Fulton which required that he tell the truth, and elicited from him testimony that he was not present for the murder, but instead was an important figure primarily because he allegedly heard Trendon Washington threaten to harm Paige, and subsequently admit that [Washington] had done so.

The trial court was informed that Fulton received a deal to secure his testimony and was not charged with respect to the murder.

The State acknowledged that it did call Fulton but it did not call Simon as a witness in the prior prosecution of Trendon Washington. In this case, the State planned on calling Simon, but not Fulton. Appellant's counsel informed the court that, although Fulton was listed as a witness in this case, the State had just informed appellant the day before that Fulton would no longer be called as a State's witness.

The court stated that appellant could call Fulton. Appellant responded that she had not obtained a writ for Fulton, who was presently incarcerated at the Eastern Correctional Institute. The court ruled that, based on this proffer, it would issue a writ for Fulton. The court also ruled that, if Fulton became a hostile witness, defense counsel would be permitted to ask leading questions on direct examination.

The court then asked appellant's counsel, in order to understand appellant's motions, to clarify the distinctions between Fulton's and Simon's expected testimony. Counsel proffered that Simon would testify that Fulton was present the night of the murder and was giving encouragement during the course of the crime. Fulton, however, would testify that this encouragement actually happened several days before the murder, and that the only reason he pleaded guilty to conspiracy was because the State offered him a deal in exchange for his testimony. The court concluded that defense counsel had satisfactorily explained why Fulton was not summoned, and

the court would assist counsel in securing his presence for trial.

This issue arose at trial during Detective Lloyd's cross-examination. Detective Lloyd admitted he was present at a meeting on December 5, 2008, with Fulton, Fulton's attorney, and the prosecutor. When Detective Lloyd was asked if a deal was struck with Fulton at that time, the State's objection was sustained. At the ensuing bench conference, the court noted that Fulton would not be a State's witness and questioned the relevance of a deal with Fulton. Defense counsel replied the fact of a deal was relevant because Fulton gave different testimony at Trendon Washington's trial concerning the incident than was given by Simon in appellant's trial.

The court responded that appellant could call Fulton to impeach Simon, and counsel indicated that was her intention. As to why the deal between the State and Fulton was relevant in this case, defense counsel asserted that, in Fulton's version at Washington's trial, Washington told Fulton that he "was going to do something to Paige. He was going to mess him up or hurt him or some such language. Allegedly my client was sitting in the car with Jamal Fulton when this conversation took place. My client was completely quiet."

Defense counsel maintained that the State "got in bed with Jamal Fulton," and that, by cutting a deal, they believed Fulton's version of events. The court clarified counsel's position as being that "the State is bound by the testimony as they put on with Fulton." Defense counsel agreed, contending, "this is a whole lot different from a situation where the defense develops a witness and the person is contradictory. These are two witnesses developed by the State and they chose not to call Leroy Simon in the other case and they are choosing in this case not to call Jamal Fulton because the two statements are completely contradictory." Again, the court responded that the defense could call Fulton and

> let Fulton say that I got this deal and I went in and I said X, and to the extent that that differs from Simon you have it, and to the extent that he has been in your view, if this is

your view, bribed or induced by the State and not brought forward here, you have that, and you can argue that.

The State responded that "how to try one case in one trial, to try a wholly separate defendant is trial strategy. That doesn't go before a jury." Further, the State proffered that Fulton's deal in connection with the Washington case was irrelevant because Fulton "didn't take a deal to testify against [appellant]."

The court then suggested that defense counsel's position was that there was prosecutorial misconduct involved. After further argument, the court reserved ruling, asking that the parties produce case law on the matter. The court stated that the State's position in the first case "would be in effect an admission and therefore—against you, a party, and admissible in this case." But, the "question would be how material is the difference."

After the jury was excused, defense counsel proffered Fulton's testimony from the Washington trial, which culminated in Fulton not putting himself at the scene of the murder. The State explained that Fulton was called in the first trial to provide a motive for the killing, and to testify to Washington's admissions that he was going to do something to Paige, and that Washington did admit to the killing afterward. When asked if Fulton gave the State anything else, the State replied: "Nothing with regard to this gentleman," presumably referring to appellant.

Defense counsel then stated that Fulton pleaded guilty to conspiracy to commit murder "and he got a sentence of five years and he was to testify truthfully, that's part of the deal, at the trial of Trendon Washington." [4] After the State re-

---

4. The next day, defense counsel apparently gave the court some form of written agreement between Fulton, his attorney, and the prosecutor. The only evidence of such an agreement in the record is contained in the State's supplemental disclosure during pretrial discovery, where the State averred that:

On December 15, 2008, Jamal Fulton entered into a Cooperation Agreement with the State of Maryland. Mr. Fulton has agreed to

sponded that there was no need to introduce evidence of Fulton's deal with the State, the court tended to agree, stating to defense counsel:

If [the prosecutor]'s calling Fulton, clearly you have every right to show he's singing for his supper, he's been bought by the State. If you are calling him, what's the relevance that he made a deal with the State earlier? Because it seems we can cut the other way. Then he lied in the earlier case which, as to Trendon [Washington] is not really your problem.

Defense counsel replied she had not seen the deal, and the State relied on what Fulton said as being truthful. The State indicated that Fulton testified as he did, and defense counsel could not "use the State to bolster and make his credibility even greater because the State stood behind it." The trial court again indicated that "[i]t's called an admission." The State replied that "I did not go before the jury and say Jamal Fulton is telling the truth." The court disagreed, suggesting that it was implicit in the prosecution of Washington that the State wanted the jury to believe Fulton.

At this point, the State sought to narrow the issue to how this affected the trial of appellant. The State said, "[y]ou can have Jamal Fulton not at the scene and still have [appellant] there. They could still believe Leroy Simon that he saw [appellant] and maybe not ..." The court asked the prosecutor to "[s]low down a minute because you have a point." The court then ruled the defense could call Fulton, but the issue of whether the deal with Fulton was admissible during the defense case required further consideration.

The next day, defense counsel presented to the court the case of *Sifrit v. State*, 383 Md. 77, 857 A.2d 65 (2004), *cert. denied*, 543 U.S. 1056, 125 S.Ct. 929, 160 L.Ed.2d 780 (2005). Defense counsel informed the court that the holding of that

testify truthfully and fully about the events surrounding the death of Ricardo Paige. In return for Mr. Fulton's truthful testimony, he will receive a sentence of 5 yrs on the charge of conspiracy to commit murder.

case was, essentially, that "[a]s long as you have a continuing underlying premise then there is no due process violation . . ." The court was also directed to a federal case, *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.), *cert. denied*, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000), wherein the court ruled that "the use of inherently factually contradictory theories violates the principles of due process." The court again reserved ruling, and, after the State rested its case, spent the remainder of the day considering jury instructions in this case.

The next day, defense counsel moved for a mistrial, contending it wanted to call Fulton and wanted to elicit that there was a deal that Fulton would testify in any trial related to the murder of Paige. Defense counsel stated on the record that the written agreement had been provided to the trial court. Defense counsel, again, maintained that the State was asserting alternative theories concerning the murder and that this amounted to a due process violation.

Defense counsel also obtained a copy of the recording of Fulton's plea hearing before another member of the circuit court. She proffered that the statement of facts from that hearing was consistent with Simon's version of events, not Fulton's. In addition, the judge that took Fulton's plea was informed that Fulton was present at the scene at the time of the murder. At the conclusion of the prosecutor's proffer, Fulton's counsel offered no additions or subtractions, but stated that Fulton "would agree that the statement just read would be the testimony of the witnesses that the State would call, but this would not be Jamal Fulton's testimony." Counsel therefore concluded the State knew, prior to Fulton's testimony at Washington's January 2009 trial, that there was this different version of the facts.[5]

---

5. We note that a recording of Fulton's plea hearing is in the record on appeal, and that recording is consistent with defense counsel's proffer of those proceedings. In addition, the State on appeal asks us to take judicial notice of the transcript of Fulton's trial testimony, contained with the record in *Washington v. State*, No. 461, Sept. Term, 2009. We do so pursuant to Maryland Rule 5–201(c), which provides that "[a]

In response, the court observed that the State wanted to use Fulton in Washington's trial simply to elicit Washington's admission to the murder. The court further observed that "[Fulton] was, from the State's point of view telling the truth about A, he was minimizing as to B, his being present." The court then denied the motion for mistrial, stating:

Somewhere down the line the issue of whether his deal, which is I think the real reason if I might add that the defense wants to call him, is just to hang this deal around the State and choke them with it, and, you know, more power to you if you can. I just don't think I can allow it. The deal is only relevant when the State calls him ...

Further, after noting that *Sifrit* and the federal case cited by the defense required that the alternative theories "go to the core issue," the court stated:

I think an example of the core issue is where you have two people and the State ridiculously in the first case to get a conviction against defendant A said this guy had to be the shooter, nobody else could have been the shooter, and blah, blah, blah, and then they turn around and say the same thing with regard to defendant B.

The court continued:

THE COURT: We don't have that here. I mean the State has been consistent that they don't know who did the shooting, they don't know who pulled the trigger, they know who is, they claim through Mr. Simon that they know who was—on the other evidence in the case who was was [sic] outside of the house, who went in the house, who came out of the house, but as to who actually pulled the trigger, they don't have it. So I don't see anything approaching prosecutorial misconduct or duplicity or a due process violation. If there were a due process violation, which I don't think there is, the remedy that the defense seeks is to basically hang the plea agreement or bring it out in front of the jury. A, I

court may take judicial notice, whether requested or not." After the plea hearing, Fulton testified in Washington's trial on January 14, 2009.

just think that would be inappropriate. And furthermore, I think if somehow it were relevant, I don't think it is, I think it should be excluded under 5–403, because to get into the trial of—who was it, Washington?

[PROSECUTOR]: Yes, sir, Your Honor, Trendon Washington.

THE COURT: To get into the trial of Washington and what Mr. Fulton said in that trial and whether Washington was convicted, I think is collateral. . . .

The court then directed neither side to mention the prior trial of Trendon Washington or reference the State's deal with Fulton. Fulton could testify to facts, and defense counsel was granted a continuing objection, but there was to be no mention about Fulton's deal, Trendon Washington's trial, or the results of Washington's trial.

Following this ruling, the defense then called Fulton. In brief, Fulton testified that Washington was angry after someone stole his drugs from 508 East 43rd Street, that Washington and appellant spoke to Paige on March 18, 2007, and that afterwards Washington indicated that he was going to beat and kill Paige. Two days later, and prior to discovery of Paige's body, Washington stated to Fulton, "I done what I said I was going to do." Fulton understood this to mean that Washington had killed Paige.

A. Appellant was not denied due process where the State called different witnesses at his trial and the trial of his alleged co-perpetrator, Trendon Washington.

On appeal, appellant maintains that the court erred by not admitting evidence of Fulton's plea agreement on due process and evidentiary grounds. As to the due process 29 claim, appellant asserts that issues of fairness precluded the State from "pressing the prosecution upon a theory which contra- dicted its theory in an earlier prosecution[.]" The State responds that "the State has never claimed that Washington was solely responsible for Paige's death, nor has it ever spoken from both sides of its mouth about Armstead's role in

the murder." Further, appellee continues that "[t]he State simply relied on two different witnesses, Fulton and Simon, to obtain a complete account of the crime told over two trials."

Concerning whether the prosecution could be permitted to pursue alternative theories in Washington's and appellant's trials, appellant acknowledges that the Court of Appeals addressed such a claim in *Sifrit*, 383 Md. at 106, 857 A.2d 65. In that case, after reviewing cases from other jurisdictions, the Court held:

> Based on our analysis of the relevant case law, we are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process.

*Id.*

Based on a review of the transcript from Washington's trial, we conclude that Fulton's testimony for the prosecution in that case was substantially similar to his testimony in this case. As he did in this case, Fulton testified at Washington's trial that, on March 18, 2007, Washington was angry with Paige because he believed that Paige stole his drugs and that he had "to deal with him." Both Washington and appellant went to Paige's door and discussed the issue with him. After Paige denied knowing anything about the theft, Washington told Fulton that "he's got to do something to him, 'cause he took his drugs.'" Two days later, Washington told Fulton, "I

took care of him," indicating that he shot Paige. Fulton maintained that he was not in the area when Paige was killed. Notably, Fulton began his direct examination in Washington's trial by stating he was testifying pursuant to a written agreement whereby he would receive five years on a lesser charge by cooperating with the State. Fulton was also cross-examined about his agreement with the State and the amount of time he was to serve, admitting that he was probably going to serve about another year.

Thus, at its core, the ultimate issue in both Washington's and appellant's trial was whether they or either of them committed the murder of Ricardo Paige. In Washington's trial, Fulton's account provided direct evidence that Washington was a principal in the first degree. On the other hand, Fulton's account did little, if anything to implicate appellant, because Fulton only admitted to being with Washington and appellant two days before the body was found.

Not calling Fulton at appellant's trial was not, in our view, an irreconcilable inconsistency. The State explained that it did not call Fulton as a prosecution witness in appellant's case because Fulton could not place appellant at the scene of the murder. That explanation was not unreasonable, and we discern no due process violation. Indeed, prior to trial, the State proffered that Fulton had "never implicated [appellant] as being part of this crime. That's been the problem the whole time. That was the problem that we had because no one would come forward and say what [appellant's] part was." It is not clear why the prosecution did not call Simon in Washington's case, but that would appear to be a matter of prosecutorial discretion. *See Evans v. State*, 396 Md. 256, 298, 914 A.2d 25 (2006) ("State's Attorneys retain broad discretion . . . in determining which cases to prosecute, which offenses to charge, and how to prosecute the cases they bring.").

B. The fact that the State had a plea agreement with Fulton was not admissible as an adopted admission.

Appellant asserts that exclusion of the terms of the plea agreement was error under evidentiary principles. Ap-

pellant suggests that the plea agreement was admissible to impeach Simon's credibility, stating that "[e]xtrinsic evidence contradicting a witness's testimony upon a non-collateral matter is admissible." Appellant also asserts that the existence of the plea agreement itself was admissible as an adopted admission by the State. We will address the latter contention first.

Appellant asserts: "While a party in Maryland no longer (ordinarily) vouches for the credibility of a witness, the State clearly manifested a belief in the truth of Fulton's testimony when it bound him by contract to tell the truth and then called him as a witness." Appellant further contends that the evidence was admissible under this theory because "[i]ts calling him at Washington's trial was the 'act' of Mr. Armstead's party-opponent."

The State responds that "[t]his novel argument was never lodged with the trial court and is therefore unpreserved." The record reveals, however, that this argument was suggested by the trial court itself. We conclude that the rule concerning adopted admissions does not extend to the fact of and the terms of the plea agreement in this case.

Maryland Rule 5–803(a) permits the introduction of a hearsay statement that is offered against a party and is either the party's own statement or one in "which the party has manifested an adoption or belief in its truth." Rule 5–803(a)(1), (2); *see also State v. Brown*, 327 Md. 81, 88, 607 A.2d 923 (1992) (admission of a party opponent is admissible because "an admission is a statement of pertinent facts which, in connection with proof of other facts, tends to prove guilt") (quoting *Holland v. State*, 244 Md. 671, 673, 224 A.2d 864 (1966)); 2 *McCormick on Evidence* § 254, at 178 (6th ed., 2006) ("Admissions are the words or acts of a party or a party's representative that are offered as evidence by the opposing party.").

The State directs our attention to *Bellamy v. State*, 403 Md. 308, 941 A.2d 1107 (2008). There, the State entered into a plea agreement with a witness to murder, Andre Saunders. *Id.* at 315–18, 941 A.2d 1107. Prior to a proffer of the pertinent facts in support of that plea, the State informed the

trial court that Saunders had provided a written statement and that the State believed Saunders to be truthful. *Id.* at 315–16, 941 A.2d 1107. The court then heard a proffer of facts, based on Saunders's statement, in which Saunders informed the State that a person named Welch, not Bellamy, had shot the victim. *Id.* at 317, 941 A.2d 1107.

At Bellamy's trial, Bellamy sought to call both Saunders and Welch, but they invoked their Fifth Amendment privilege against self-incrimination. *Id.* at 318, 941 A.2d 1107. Bellamy then sought to have the portions of the proffer of facts from Saunders's plea hearing admitted into evidence, and that request was denied by the trial court. *Id.*

On appeal, the Court of Appeals concluded that the statement of facts from Saunders's plea hearing should have been admitted at trial as an admission of a party opponent, but that, ultimately, any error was harmless beyond a reasonable doubt. *Id.* at 319, 335, 941 A.2d 1107. As for the merits, the Court stated:

> [T]he Assistant State's Attorneys unequivocally manifested an adoption of or belief in Saunders's statement when they said, "And it is our belief, based on our investigation and review of everything, is that he's been truthful," "We want him to be truthful and we believe he has been," and, "But our understanding is the truth has been reduced to writing and the statement he provided to us." Without this express, in-court adoption of Saunders's statement, our view may have been different. *Whether lesser actions by a prosecutor manifesting an adoption of a statement, such as merely submitting the statement in support of a court filing or acceptance of a plea, would render the statement admissible against the government in a subsequent proceeding remains to be seen.*

*Id.* at 326, 941 A.2d 1107 (emphasis added).

Further, applying a test from the United States Court of Appeals for the Second Circuit, the Court concluded that the evidence was admissible:

As noted above, the three-part test requires (1) an assertion of fact clearly inconsistent with a subsequent assertion at trial; (2) the assertions of fact were equivalent to testimonial statements; and (3) that inference that the party seeking to admit the evidence wants to have the fact finder draw is a fair inference, and there is not an innocent explanation for the inconsistency. The implicated elements of the test would be satisfied in the present case. The assertion that Welch shot Carter is clearly inconsistent with the State's later assertion that Bellamy shot Carter twice. Finally, the inference that Bellamy obviously desired the jury to draw, that the State at one point believed that Welch was the sole shooter, is a fair inference.

*Id.* at 329–30, 941 A.2d 1107.[6]

In this case, we need not decide whether Fulton's version of events would have been admissible as an adopted admission because those facts ultimately were admitted as part of the defense case. As to whether the fact that there was a plea agreement, and, presumably, its terms, constitute an adoptive admission, we are not persuaded that *Bellamy* extends that far. Indeed, prosecutors enter into plea agreements with criminal defendants for any number of reasons. *See Santobello v. New York,* 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ("Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons."); Weinstein, *ARTICLE: Regulating the Market for Snitches,* 47 Buffalo L.Rev. 563, 566–567 (1999) ("Prosecutors enter into plea agreements for a number of reasons, but chiefly because they are efficient and virtually risk free."); Weisselberg and Dunworth, *Inter-district Variation under the Guidelines: the Trees May Be More Significant than the Forest,* 6 Fed. Sent. R. 25 (1993) ("Prosecutors have their own varied reasons for deciding whether to offer an

---

**6.** The Court ultimately held that exclusion of this evidence was harmless because, even under the excluded statement of facts, the evidence would be sufficient to convict Bellamy of aiding and abetting in the murder. *Bellamy,* 403 Md. at 334–35, 941 A.2d 1107.

attractive deal, including the defendant's criminal history, whether the case is difficult to prove, local custom, and workload in the office."); Frase, *ARTICLE: Comparative Criminal Justice as a Guide to American Law Reform: How Do the French Do It, How Can We Find Out, and Why Should We Care?*, 78 Calif. L.Rev. 542, 636 (1990) ("[L]eniency [in sentence bargaining] is extended for the same reasons that judges and prosecutors explicitly offer lenient treatment to defendants who cooperate: the perception that such defendants deserve less punishment, that lesser punishment is necessary to induce an acceptable number of guilty pleas, or for both these reasons."). Accordingly, we do not agree that, standing alone, the fact that the State had a plea agreement with Fulton is admissible under the theory that the agreement was an adopted admission.

    C.   Even if we were to assume that disclosure of the State's plea agreement with Fulton would have served to impeach Simon's credibility, the exclusion of the evidence to prevent unfair prejudice and juror confusion was not an abuse of discretion, and any error was harmless beyond a reasonable doubt.

Citing Rule 5–616(b)(2), appellant argues, "Fulton's version of the events would have carried far more weight had the jury been apprised that the testimony was being provided pursuant to an agreement with the State to tell the truth, violation of which would carry severe consequences for Fulton." For that reason, the introduction of the plea agreement would have "tended to undermine the credibility of Simon's very different version, and thus to undermine the State's case against Mr. Armstead."

The State responds that "the only discrepancy between Fulton's testimony and Simon's testimony concerned whether Fulton was at the scene of the crime—a matter collateral to the question of Armstead's participation, about which Fulton said nothing."

In the context of this case, whether the fact that a defense witness has entered into a plea agreement to testify for the State in an earlier trial of a co-defendant should be admitted into evidence is a somewhat unique question, because generally it is the State that calls the witness that has entered into a plea agreement.

Here, appellant seeks to introduce evidence of Fulton's plea agreement, not to impeach Fulton, who is testifying as a witness for the defense, but, instead, to "undermine the credibility" of Simon, the State's only witness who puts appellant at the scene of the crime. In other words, evidence that Fulton's plea agreement with the State required him to testify "truthfully," would serve to bolster Fulton's testimony and discredit Simon's.

Rule 5–616 (b)(2) provides: "Other extrinsic evidence contradicting a witness's testimony ordinarily may be admitted only on non-collateral matters. In the court's discretion, however, extrinsic evidence may be admitted on collateral matters." Here, Simon's credibility is relevant.

In cases where the State has offered testimony of witnesses on direct examination revealing that they entered plea agreements in exchange for their testimony, Maryland courts have allowed such testimony, without comment. *See Wiggins v. State*, 90 Md.App. 549, 577, 602 A.2d 212 (1992) ("What the State brought out during direct examination of Ms. Cooper is that there was a plea agreement, under the terms of which she pleaded guilty to kidnapping, theft, and burglary, and her sentence was capped at 35 years."); *Collins v. State*, 318 Md. 269, 282, 568 A.2d 1 (1990) ("Michie thoroughly outlined his plea agreement with the State during his direct examination."), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990).

The United States Court of Appeals for the Fourth Circuit, in *United States v. Henderson*, 717 F.2d 135, 138 (4th Cir.Md. 1983), *cert. denied*, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984), reviewed a challenge by a defendant to a witness's testimony elicited by the State on direct examination that the

witness entered into a plea agreement with the State, one of the terms of which was that he was required to testify truthfully. The Court stated:

> In the present case, there is no evidence that the government derived any improper advantage from [the witness's] testimony concerning his promise to be truthful. The prosecutor's questions do not imply that the government had special knowledge of [the witness's] veracity. The trial judge instructed the jury on the caution necessary in evaluating testimony given pursuant to a plea bargain. Henderson makes no claim that the prosecutor made improper use of the plea bargain promise of truthfulness in closing argument. The promise was not "disproportionately emphasized or repeated." [*United States v. Halbert*], 640 F.2d [1000,] 1005 [ (1981) ].

> We conclude therefore that the district court did not abuse its discretion in permitting the government to introduce the terms of [the witness's] plea bargain during the government's case in chief.

In *Smith v. United States,* 687 A.2d 1356, 1367 (D.C.1996) (emphasis added; internal quotation marks and citations omitted), *vacated,* 699 A.2d 348 (D.C.1997), *and "reinstate[d]*," 709 A.2d 78, 83 (D.C.1998), the District of Columbia Court of Appeals held that "elicitation during direct examination of a plea agreement containing a promise to testify truthfully does not constitute impermissible bolstering of the witness' credibility," and that the admission of a plea agreement does not "suggest to the jury that special credence should be attached to the witness' testimony." *Id.* at 1366 (citing *United States v. Spriggs,* 302 U.S.App.D.C. 54, 58, 996 F.2d 320, 324 (1993)).

In *Woods v. United States,* 987 A.2d 451, 455–456 (D.C. 2010), the District of Columbia Court of Appeals considered "whether the government may introduce evidence of a plea agreement with a government witness [ ("Harris") ] on direct examination where the defense has stipulated that it will refrain from cross-examination regarding bias relating to that plea agreement." *Id.* at 455. The appellant argued that

"because he stipulated at trial that he would not cross-examine Harris regarding bias stemming from his plea agreement, the government had no basis for introducing the terms of the plea agreement which arguably bolstered Harris' testimony impermissibly." *Id.*

The government argued that "blunting anticipated impeachment by the defense is only one purpose in admitting a plea agreement on direct examination, noting that evidence of a plea agreement also prevents the jury from speculating as to why a person whose testimony implicates him in the alleged crime has not been charged." *Woods*, 987 A.2d at 455.

The *Woods* Court concluded:

We fail to see why the holding in *Smith*—that the admission of a plea agreement on direct examination "[does] not constitute improper prosecutorial vouching for [the witness'] veracity"—should not apply with equal force here, irrespective of appellant's stipulation at trial to forgo cross-examination on the issue. [*Smith*, 687 A.2d] at 1367 (internal quotation marks and citations omitted); *see, e.g., United States v. Richardson*, 421 F.3d 17, 40 (1st Cir.2005) (holding that a party may "preemptively impeach" its own witness, "even where the defendant agrees to forego [sic] impeachment on cross-examination"); [ ] *United States v. Montani*, 204 F.3d 761, 765–67 (7th Cir.2000)[.]

*Id.* (Some citations omitted.)

The Court held that, though the jury could have found the plea agreement "a decisive factor in crediting Harris' testimony," "equally likely is the possibility that the jury could have found such testimony suspect precisely because it was elicited subject to a plea agreement. This 'double-edged sword' makes it hard to conclude that either party was prejudiced or favored over the other by admission of the plea agreement." *Id.* (Citation omitted.)

The Court also held that "evidence of the plea agreement also serves to extinguish jury speculation about why a particular witness who is connected to the crime is not being charged." *Id.* at 456. And it found that the "introduction of

the entire plea agreement permits the jury to consider fully the possible conflicting motivations underlying the witness' testimony and, thus, enables the jury to assess more accurately the witness' credibility." *Id.* (quoting *Smith,* 687 A.2d at 1366 (quoting *United States v. Townsend,* 796 F.2d 158, 162 (6th Cir.1986))).

As Maryland courts, as well as others, have allowed disclosure of plea agreements on direct examination by the State, we see no reason why the rationale of preemptive impeachment for admitting such evidence might not apply in the rare case when the witness who entered into an agreement with the State is called as a witness for the defense.

Here, of course, the proffered purpose is not preemptive impeachment, but rather the bolstering of the witness's credibility, which, as a general rule, is not allowed. But, on the other hand, we acknowledge that bolstering of Fulton's credibility could possibly have the effect of undermining Simon's credibility. Therefore, we will assume, without deciding, that the introduction of the plea agreement is relevant evidence that could be introduced under Rule 5–616(b)(2).

But, under Rule 5–403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See Decker v. State,* 408 Md. 631, 640, 971 A.2d 268 (2009) ("Relevant evidence may be excluded, however, if it is unfairly prejudicial, confusing to the fact finder, or a waste of time"); *see also Tipton v. State,* 39 Md.App. 578, 585, 387 A.2d 628 (even if relevant, trial judge should weigh factors going to probative value, such as likelihood jury may be aroused by emotion or otherwise distracted; that evidence will consume an undue amount of time; and the danger of unfair surprise), *cert. denied,* 283 Md. 739 (1978).

Further, the decision whether to admit evidence based on an argument that its probative value is substantially outweighed by the danger of misleading the jury is a matter of

judicial discretion. *Falik v. Hornage,* 413 Md. 163, 190, 991 A.2d 1234 (2010) ("[I]t is within the court's discretion to exclude even relevant evidence if the court determines that 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" Md. Rule 5–403); *see also Cooley v. State,* 385 Md. 165, 175, 867 A.2d 1065 (2005) ("Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law") (citation omitted); *Fontaine v. State,* 134 Md.App. 275, 288, 759 A.2d 1136 ("thus, where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal"), *cert. denied,* 362 Md. 188, 763 A.2d 734 (2000).

Here, the circuit court stated:

> To get into the trial of Washington and what Mr. Fulton said in that trial and whether Washington then was convicted, I think is collateral. What I want to tell this jury is to focus on this case and this case only, and to get into what Fulton—and indeed, if you are going to call Fulton and if you want to impeach him with trial testimony or previous trial testimony, I would ask either side to just, if you have to refresh his recollection just make a reference to did you testify at a prior proceeding. I mean clearly you can impeach if you have something, but I don't want any references to there having been a trial of Mr. Washington or Mr. Fulton having testified in that trial.

The circuit court was clearly concerned that the admission of the plea agreement into evidence would open the door to the details of Washington's trial, and, perhaps, testimony concerning the outcome of that trial. Because he was acting to foreclose the introduction of evidence of what occurred at Washington's trial so as to prevent unfair prejudice or jury confusion, we are not persuaded that the circuit court exercised its discretion "in an arbitrary or capricious manner" or "acted beyond the letter or reason of the law." *Cooley,* 385

Md. at 175, 867 A.2d 1065. In sum, we are persuaded that any error iń not admitting evidence of the plea agreement would be harmless beyond a reasonable doubt. *See Bellamy,* 403 Md. at 332, 941 A.2d 1107 (" 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict' ") (citation omitted); *see also Clark v. State,* 140 Md.App. 540, 565, 781 A.2d 913 (2001) (error for appellate purposes "may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling") (citing Md. Rule 5–103(a)), *cert. denied,* 368 Md. 527, 796 A.2d 695 (2002).

Though disclosure of the plea agreement might have operated to bolster Fulton's credibility and, in doing so, undermined Simon's, such disclosure could have had the opposite effect and operated, instead, to undermine Fulton's credibility. *See Woods,* 987 A.2d at 455 ("Appellant argues that the jury could have found the plea agreement a decisive factor in crediting [the witness's] testimony. But equally likely is the possibility that the jury could have found such testimony suspect precisely because it was elicited subject to a plea agreement." (citing *Smith,* 687 A.2d at 1366.)).

Moreover, Fulton testified that he was not present when the murder occurred. He further testified that, before the murder, it was Washington who threatened Paige. And, on the day that the body was discovered, Washington confessed to the murder to Fulton. Beyond testifying that appellant was present when Washington had confronted Paige about the missing drugs two days before Paige's body was found, Fulton offered nothing to implicate appellant in the actual murder.

IV.

Appellant next asserts that the trial court erred by admitting evidence that the State's witness, Leroy Simon, had been threatened. The State responds that the trial court properly exercised its discretion on this issue.

■ Prior to trial, there was limited information presented to the court about threats to Simon. The State informed the court that someone made a "brazen" statement to Simon while he was with a detective. The prosecutor asked the court to instruct the witnesses with respect to witness intimidation. The court agreed that it would make a generalized statement outside the presence of the jury. Defense counsel requested that this alleged intimidation not be presented to the jury, and the court agreed at this time that it would not be admitted at trial.

During trial, and at the conclusion of his cross-examination, Simon stated, "I got something I need to say." Then, on redirect examination, after the prosecutor asked him what he wanted to say, Simon replied, "I'm saying, Your Honor, I am doing the best I can. I—I—was frightened, my life was threatened the day [sic] so I'm doing the best I can."

The court then directed the parties to come up to the bench. After the court found that this testimony was prejudicial, defense counsel moved for a mistrial. The court denied the motion, indicating it would give a curative instruction. Defense counsel maintained she wanted a mistrial, but also requested the curative instruction. The court then instructed the jury as follows: "Ladies and gentlemen, strike—I'm going to strike the last question and answer. Please disregard the last question and answer. They have nothing to do with this case."

Continuing, Simon maintained he was nervous while testifying at trial. Simon was then asked about defense counsel's question on cross-examination, asking why Simon did not go to the police, and Simon replied, "I was scared." Another bench conference then ensued in which defense counsel objected. The State offered that this was relevant because the issue had been raised during cross-examination. The court overruled the objection to this testimony, because it went to "why he is scared or didn't come forward or what have you." The court distinguished this testimony from any testimony that Simon was specifically threatened. When Simon's testimony re-

sumed, he reiterated that he did not go to police initially "[b]ecause I was scared. In the street, you just don't tell on nobody."

Following the lunch recess, the prosecutor proffered that, two or three days ago, after the motion to suppress a photo array, Simon had been approached by women outside the courtroom and was threatened. One person said, apparently in Simon's presence, "that is the witness," and the other person said, "okay, I'm going to deal with it." The prosecutor continued that "[e]ver since that point this man has been in fear of his life." The prosecutor therefore asked the court to reconsider its prior ruling striking Simon's testimony that he had been threatened. Citing *Washington v. State*, 293 Md. 465, 445 A.2d 684 (1982), the prosecutor contended that the threat was admissible to explain Simon's inconsistent statements in his testimony.

In response, appellant's counsel replied any inconsistency in Simon's statements or testimony could be explained for reasons other than the alleged threat, for instance, by Simon's memory of an incident that occurred two years earlier. The court disagreed, noting that Simon said at the end of cross-examination that "I'm doing the best I can.... I think in fairness, he was explaining the inconsistencies that you got into."

After further argument, the court ruled that the testimony, with a limiting instruction, could be considered. After the court discussed with the parties what would be an appropriate instruction, the jury returned to the courtroom, and the court instructed them as follows:

> Thank you, counsel. Ladies and gentlemen, I made a mistake before lunch that I want to correct with you now. You may remember the last witness was Mr. Simon and I think on redirect in response to a question he said something to the effect of my life was threatened and I am doing the best I can in terms of recollection and/or alleged prior inconsistent statements. I told you to strike that, but having had the opportunity to do some research over lunch,

I was wrong. Put it back in the case, but I wish to give you this limiting instruction on that.

You may consider that testimony from Mr. Simon only for the very limited purpose of weighing or deciding his credibility or in explaining or tending to explain any previous inconsistent statements that he gave. You may not use it and must not use it as substantive evidence against the defendant because there is absolutely no evidence that the defendant was involved in any such threats or even knew about them. All right. Thank you counsel.

■ It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence. *See Conyers,* 354 Md. at 176, 729 A.2d 910; *accord Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998); *see also* Md. Rule 5–104(a) (stating the "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court"). Thus, a trial court's evidentiary ruling should not be disturbed absent error or a clear abuse of discretion. *Conyers,* 354 Md. at 176, 729 A.2d 910; *Hopkins,* 352 Md. at 158, 721 A.2d 231.

In *Washington v. State,* 293 Md. 465, 445 A.2d 684 (1982), the Court of Appeals stated that "[e]vidence of threats to a witness, or attempts to induce a witness not to testify or testify falsely, is generally admissible as substantive evidence of guilt when the threats or attempts can be linked to the defendant and not admissible as substantive evidence absent such linkage." *Id.* at 468 n. 1, 445 A.2d 684. The Court recognized, however, that evidence of threats to a witness, or fear on the part of a witness, is generally admissible in criminal cases, even if the threats or fear are not linked to the defendant. *Id.* at 470, 445 A.2d 684.

Following the dictates of *Washington,* this Court, in *Brown v. State,* 80 Md.App. 187, 194, 560 A.2d 605 (1989), stated that the issue then before it was not one of whether the evidence was admissible substantively, but whether it was admissible as it related to the witness' credibility. This Court again quoted *Washington:*

"Pursuant to the rule permitting explanations of prior inconsistent statements, it is generally held that evidence of threats to a witness or fear on the part of a witness, in order to explain an inconsistency, is admissible in criminal cases for credibility rehabilitation purposes even if the threats or fear have not been linked to the defendant." *Id.* at 194, 560 A.2d 605 (quoting *Washington*, 293 Md. at 470, 445 A.2d 684).

We held that the trial court properly admitted the evidence of the threats in order to show its effect on the witness's state of mind. *Id.* Further, the evidence was not hearsay, as it was not offered for the truth of the matter asserted, and this evidence was properly admitted to rehabilitate the witness' credibility. *Id.* at 194–95, 560 A.2d 605. *See also* Rule 5–616(c) (permitting rehabilitation of a witness whose credibility has been attacked).

Here, at numerous times during Simon's cross-examination, his memory needed to be refreshed with his taped statement. Simon could not remember if he told Detective Lloyd that there were two people outside Paige's house that he did not recognize. Simon did not remember if he told police that he recognized the face of the person who remained outside during the incident. He did not remember everything that that person said, other than "handle your business."

Simon was also very inconsistent about what time of day this incident occurred, testifying at trial that it happened during daylight hours, but telling police that it was "[d]efinitely night time." Simon even had trouble remembering his date of birth. Further, during closing argument, defense counsel went through a litany of Simon's inconsistencies in an effort to undermine Simon's credibility.

Considering this record, we hold that the trial court did not abuse its discretion in admitting evidence that Simon felt frightened and scared. The pertinent comment before the jury came at the end of cross-examination and arguably was Simon's attempt to explain any inconsistencies elicited by defense counsel. As this was admissible solely for purposes of

assessing Simon's credibility, the evidence was properly admitted at trial.

## V.

Finally, appellant contends the evidence was insufficient to sustain his conviction for conspiracy to commit murder on the grounds that there was no evidence of an agreement in this case.[7] The State disagrees on the grounds that "a rational jury could readily conclude beyond a reasonable doubt that Armstead knew of the existence of the venture alleged in the charging document and knowingly acted in furtherance of the venture's success."

In deciding any claim relating to the sufficiency of the evidence, the appropriate inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003). *"[A]ll of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original, footnote omitted); *accord Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009). A purpose of this rule is to give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Further, "[a] valid conviction may be based solely on circumstantial evidence." *Smith*, 374 Md. at 534, 823 A.2d 664. Additionally, "[w]eighing the credibility of witnesses and resolving conflicts in the evidence are tasks proper for the fact finder." *Id.* at 533–34, 823 A.2d 664; *see also Bible*, 411 Md. at 156, 982 A.2d 348 (stating "[the appellate court] must give deference to all reasonable inferences [that] the fact-finder

---

7. Appellant does not challenge the sufficiency of his second degree murder conviction.

draws, regardless of whether [the appellate court] would have chosen a different reasonable inference" (citation omitted)); *Sifrit,* 383 Md. at 135, 857 A.2d 88(the jury is "free to believe some, all, or none of the evidence presented").

Regarding conspiracy, the Court of Appeals has stated:

A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

*Mitchell,* 363 Md. at 145, 767 A.2d 844; *accord State v. Johnson,* 367 Md. 418, 424, 788 A.2d 628 (2002).

A criminal conspiracy may be shown by "circumstantial evidence from which an inference of common design may be drawn." *McMillian v. State,* 325 Md. 272, 292, 600 A.2d 430 (1992) (citation omitted); *accord Berry v. State,* 155 Md.App. 144, 156, 843 A.2d 93, *cert. denied,* 381 Md. 674, 851 A.2d 594 (2004). The State is not required to show a formal agreement in order to prove conspiracy. As this Court has stated, "[i]t is sufficient if the parties tacitly come to an understanding regarding the unlawful purpose. In fact, the State was only required to present facts that would allow the jury to infer that the parties entered into an unlawful agreement." *Acquah v. State,* 113 Md.App. 29, 50, 686 A.2d 690 (1996) (citations omitted). And, a conspirator "is liable for an act of a coconspirator not only when such act was part of the original plan but also when it was a natural and probable consequence of a carrying out of the plan." 4 *Wharton's Criminal Law* § 685, at 561–63 (15th ed.1996).

Here, there was evidence that appellant was with Washington on March 18, 2007, when Washington accused the victim, Paige, of stealing Washington's drugs. There was also evidence that, after appellant entered Paige's home, along

with Washington and another unidentified individual, there were sounds of "tussling." This occurred while someone was outside the residence, and was overheard to say "handle your business." Shortly thereafter, gunshots were heard emanating from the residence. After someone apparently tried to sweep up broken glass inside the residence, appellant, along with three other individuals, fled the scene. Appellant was with Washington when police recovered a handgun that matched cartridge casings recovered from the crime scene. When he was arrested in connection with this case, he was living in Georgia under an assumed name. And, when he subsequently was interviewed by Detective Lloyd, appellant asked "I already looked up the case. Why am I not just charged with conspiracy, what about the other three?", without any such information being provided to him by the police officer.

Based on this, a rational jury could infer that appellant was acting in concert with Washington, and, perhaps, others, in order to bring about the murder of the victim in this case. Therefore, the evidence was sufficient to sustain appellant's conviction for conspiracy to commit murder.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**